[No. 84187-0.   En Banc.]
Argued October 19, 2010.     Decided July 28, 2011.

KITTITAS COUNTY ET AL., *Petitioners*, v. THE EASTERN
WASHINGTON GROWTH MANAGEMENT HEARINGS
BOARD ET AL., *Respondents*.

146

Gregory L. Zempel, *Prosecuting Attorney*, and *Neil A. Caulkins* and *Suzanne M. Becker, Deputies*, for petitioner Kittitas County.

*Timothy M. Harris* (of *Goodstein Law Group PLLC*) and *Julie S. Nichols* (of *Law Offices of Stephen Whitehouse*), for petitioners Building Industry Association of Washington,

Central Washington Home Builders Association, and Mitchell F. Williams.

*Jeffrey D. Slothower* (of *Lathrop Winbauer Harrel Slothower & Denison LLP*), for petitioners Teanaway Ridge LLC, Kittitas County Farm Bureau, and Son Vida II.

*Alexander W. Mackies, Patrick W. Ryan*, and *Eric S. Merrifield* (of *Perkins Coie LLP*), for petitioner American Forest Land Company.

*Robert M. McKenna, Attorney General*, and *G. Marc Worthy, Assistant*, for respondent Eastern Washington Growth Management Hearings Board.

*Keith P. Scully* (of *Newman & Newman LLP*), for respondents Kittitas County Conservation and RIDGE.

*Keith P. Scully* (of *Newman & Newman LLP*), and *Tim Trohimovich* (of *Futurewise*) for respondent Futurewise.

*Robert M. McKenna, Attorney General, Alan D. Copsey, Deputy Solicitor General*, and *Dorothy Harris Jaffe, Assistant*, for respondent Department of Community, Trade, and Economic Development.

*Brian T. Hodges* on behalf of Pacific Legal Foundation, amicus curiae.

*Alan M. Reichman, Assistant Attorney General*, on behalf of Department of Ecology, amicus curiae.

*Margaret J. King* on behalf of City of Roslyn, amicus curiae.

*Amanda W. Goodin* on behalf of Center for Environmental Law and Policy, amicus curiae.

¶1 OWENS, J. — Kittitas County (County) and several other parties (collectively "Petitioners") challenge two final

decisions and orders of the Eastern Washington Growth Management Hearings Board (Board). The Board found several provisions of the County's revised comprehensive plan (Plan) and development code noncompliant with the Growth Management Act (GMA), chapter 36.70A RCW. Petitioners argue that the Board misinterpreted the law and acted beyond its jurisdiction, without substantial evidence, and arbitrarily and capriciously made findings related to rural and agricultural densities and uses, zoning techniques, land use near airports, and water resources. We hold that the Board did not improperly disregard evidence and appropriately found that the County violated the GMA by failing to develop the required written record explaining its rural element, include provisions in its Plan that protect rural areas, provide for a variety of rural densities, protect agricultural land, and protect water resources. However, we find that the Board improperly found that the County's airport overlay zone is noncompliant with the GMA. Finally, we decline to reach the questions of whether the Board applied a bright line rule to determine appropriate rural density and failed to protect rural areas in specific development regulations.

## FACTS

¶2 In December 2006, the County passed Ordinance 2006-63, updating its Plan as required by the GMA. Kittitas County Ordinance (Ord.) 2006-63 (Dec. 11, 2006) (Administrative Record, *Kittitas County Conservation v. Kittitas County*, No. 07-1-0004c (E. Wash. Growth Mgmt. Hr'gs Bd.) (1 AR) at 1-242); RCW 36.70A.130(4)(c). Kittitas County Conservation, RIDGE, and Futurewise (collectively "RIDGE") and the Washington Department of Community, Trade and Economic Development (CTED)[1] filed petitions for review with the Board, alleging that Ordinance 2006-63 failed to comply with the GMA. The Board held a hearing and issued a final decision and order, directing the County to further

---

[1] CTED has since been renamed the Department of Commerce. It has some oversight, rule making, and coordination authority under the GMA. *See generally* ch. 36.70A RCW.

revise its Plan and specific development regulations to achieve compliance with the GMA. *Kittitas County Conservation v. Kittitas County*, No. 07-1-0004c, 2007 WL 2729590, 2007 GMHB LEXIS 89 (E. Wash. Growth Mgmt. Hr'gs Bd. Aug. 20, 2007) (*Kittitas Conservation* I). Petitioners separately appealed the Board's order in the Kittitas County Superior Court, where their appeals were consolidated.

¶3 In the midst of that challenge, the County proceeded to revise its development code, adopting Ordinance 2007-22. Ord. 2007-22 (July 19, 2007) (Administrative Record, *Kittitas County Conservation v. Kittitas County*, No. 07-1--0015 (E. Wash. Growth Mgmt. Hr'gs Bd.) (2 AR) at 8-16). RIDGE also challenged this ordinance in proceedings before the Board. After another hearing on the merits, the Board issued a final decision and order, again concluding that the County's Plan and several of its development regulations failed to comply with the requirements of the GMA. *Kittitas County Conservation v. Kittitas County*, No. 07-1-0015, 2008 WL 1766717, 2008 GMHB LEXIS 21 (E. Wash. Growth Mgmt. Hr'gs Bd. Mar. 21, 2008) (*Kittitas Conservation* II). Petitioners separately appealed in the superior court, where their cases were again consolidated.

¶4 RIDGE filed motions for discretionary review in both consolidated cases, which were granted by Division Three of the Court of Appeals. The Court of Appeals then consolidated the two cases into one and certified it for review by this court pursuant to RCW 2.06.030.

## ISSUES

¶5 1. Did the Board improperly disregard evidence or elevate some GMA goals over others?

¶6 2. Did the Board properly determine that the County failed to develop a written record explaining the rural element of its Plan?

¶7 3. Did the Board improperly employ a bright line rule regarding rural densities?

¶8 4. Did the Board properly find that the County failed to protect rural character?

¶9 5. Did the Board properly conclude that the County failed to provide for a variety of rural densities?

¶10 6. Did the Board properly find that the County's development regulations allow for urban densities and uses in its designated agricultural land?

¶11 7. Did the Board properly determine that the County's land use decisions around its airports violate the GMA?

¶12 8. Did the Board properly determine that the County failed to protect water by not requiring disclosure of common ownership in subdivision applications?

## ANALYSIS

¶13 In reviewing growth management hearings board (board) decisions, courts give " 'substantial weight' " to a board's interpretation of the GMA. *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 498, 139 P.3d 1096 (2006) (quoting *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000)). Courts' deference to boards is superseded by the GMA's statutory requirement that boards give deference to county planning processes. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 238, 110 P.3d 1132 (2005) ("a board's ruling that fails to apply this 'more deferential standard of review' to a county's action is not entitled to deference from this court"). To make a finding of noncompliance with the GMA, a board must find that a county's actions are "clearly erroneous," RCW 36.70A.320(3), meaning the board has a " 'firm and definite conviction that a mistake has been committed.' "[2] *Lewis County*, 157 Wn.2d at 497 (quoting *Dep't of Ecology v.*

---

[2] The concurrence/dissent (J.M. Johnson, J.) makes much of the fact that the boards are unelected; however, the legislature created and authorized boards to review, with great deference, local land use decisions for compliance with the GMA. Former RCW 36.70A.250 (1994), *amended by* Laws of 2010, ch. 211, §§ 4, 17 (creating one statewide board, rather than three separate local boards); RCW 36.70A.320(3). The standard of review by which boards review a challenge to local comprehensive plans and development regulations is prescribed by statute. RCW 36.70A.320(3). Our case law clarifies the meaning of the "clearly erroneous" standard, including as it applies to boards.

*Pub. Util. Dist. No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993), *aff'd*, 511 U.S. 700, 114 S. Ct. 1900, 128 L. Ed. 2d 716 (1994)). We have also importantly recognized that the GMA "is not to be liberally construed." *Thurston County v. W. Wash. Growth Mgmt. Hearings Bd.*, 164 Wn.2d 329, 342, 190 P.3d 38 (2008).

¶14 Courts apply the standards of the Administrative Procedure Act, chapter 34.05 RCW, and look directly to the record before the board. *Lewis County*, 157 Wn.2d at 497; *Quadrant Corp.*, 154 Wn.2d at 233. Specifically, courts review errors of law alleged under RCW 34.05.570(3)(b), (c), and (d) de novo. *Thurston County*, 164 Wn.2d at 341. Courts review challenges under RCW 34.05.570(3)(e) that an order is not supported by substantial evidence by determining whether there is " 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.' " *Id.* (internal quotation marks omitted) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)). Finally, courts review challenges that an order is arbitrary and capricious under RCW 34.05.570(3)(i) by determining whether the order represents " 'willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action.' " *City of Redmond*, 136 Wn.2d at 46-47 (internal quotation marks omitted) (quoting *Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6*, 118 Wn.2d 1, 14, 820 P.2d 497 (1991)).

I. The Board Did Not Improperly Disregard Evidence or Elevate GMA Goals

¶15 The GMA requires boards to defer to counties' local planning processes, even establishing a presumption of validity for comprehensive plans and development regulations. RCW 36.70A.320(1). Petitioners contend that the Board did not give proper deference to the County and implicitly present a question about the evidentiary rule in *City of Arlington v. Central Puget Sound Growth Manage-*

*ment Hearings Board*, 164 Wn.2d 768, 193 P.3d 1077 (2008). In particular, Petitioners allege that the Board improperly "dismissed" community testimony in support of three-acre densities.[3] Petitioners argue that, under *City of Arlington*, the mere presence of evidence supporting a county decision as comporting with the GMA entitles that county to board deference. While the issue of proper deference pervades each question, Petitioners' argument and the significance of proper deference to our standard of review in GMA cases compel us to clarify the rule at the outset.

¶16 In *City of Arlington*, this court held that boards must consider anecdotal evidence and where, within the constraints of the GMA, more than one appropriate planning choice exists, boards must defer to a county's discretion. 164 Wn.2d at 788. Petitioners, however, take the rule in *City of Arlington* to the extreme point of eliminating any evaluative role for boards. The legislature granted authority to three boards to adjudicate issues of GMA compliance. Former RCW 36.70A.250 (1994), .280(1)(a) (2003). While county actions are presumed compliant unless and until a petitioner brings forth evidence that persuades a board that the action is clearly erroneous, RCW 36.70A.320(3), deference to counties remains "bounded . . . by the goals and requirements of the GMA," *King County*, 142 Wn.2d at 561. The deference boards must give "is neither unlimited nor does it approximate a rubber stamp." *Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hearings Bd.*, 161 Wn.2d 415, 435 n.8, 166 P.3d 1198 (2007). Moreover, when it comes to interpreting the GMA, the same deference to counties does not adhere, and we give substantial weight to a board's interpretation. *Lewis County*, 157 Wn.2d at 498.

¶17 The Board did not improperly disregard evidence presented by the County. The Board was required to review all evidence supporting the County's decisions, which it did. Despite Petitioners' insistence, the cited evidence simply is

---

[3] The community testimony consists of two e-mails and a transcript of a presentation to the Kittitas County commissioners, each by a different individual or group. The testimony can generally be characterized as supporting three-acre rural densities because of economic benefits, including that it frees farm owners to sell small lots in difficult economic times.

not dispositive of many of the issues raised. For example, the community testimony does not address whether a three-acre density designation is consistent with rural character or other issues of GMA compliance but focuses instead on the nonagricultural economic needs of farmers and rural landowners. Counties may not cite to *any* fact or opinion and then call for absolute deference. Boards must be able to look to evidence and at least evaluate its relevance. To clarify, *City of Arlington* stands for the fact that boards must consider anecdotal evidence provided by counties and defer to local planning decisions as between different planning choices that are compliant with the GMA. It does not mean that counties may point to any evidence and demand unbounded deference.

¶18 Petitioners additionally assert that the Board improperly elevated some GMA goals over others, resulting in improper deference to local planning decisions. We find that this argument is without merit. Each question presented is about the requirements, not the goals, of the GMA, and we will accordingly decide the issues.

II. The Board Properly Determined that the County Failed To Develop the Requisite Written Record Explaining Its Rural Element

¶19 The GMA requires that local governments include certain mandatory elements in their comprehensive plans, including a "rural element." RCW 36.70A.070(5). The GMA specifically allows counties to consider local circumstances when planning this element, providing that

[b]ecause circumstances vary from county to county, in establishing patterns of rural densities and uses, a county may consider local circumstances, but shall develop a written record explaining how the rural element harmonizes the planning goals in RCW 36.70A.020 and meets the requirements of this chapter.

RCW 36.70A.070(5)(a). The plain language of the statute does not specify what form the written record must take, only that counties shall develop such a record. Because the

court gives substantial weight to boards' interpretation of the GMA, it is notable that boards have generally held that a "written record" need not be a discrete document but must provide an actual explanation. *See, e.g., Bayfield Res. Co. v. Thurston County*, No. 07-2-0017c, 2008 WL 2115328, at *12, 2008 GMHB LEXIS 37, at *31 (W. Wash. Growth Mgmt. Hr'gs Bd. Apr. 17, 2008); *Suquamish Tribe v. Kitsap County*, No. 07-3-0019c, 2007 WL 2694968, at *33, 2007 GMHB LEXIS 140, at *58 (Cent. Puget Sound Growth Mgmt. Hr'gs Bd. Aug. 15, 2007). We agree.

¶20 In both of its decisions, the Board found that the Plan lacks the required written record and that such a record does not otherwise exist. "The critical statement in the Board's conclusion is '. . . the County has not developed a written record explaining how the rural element harmonizes the planning goals in the GMA and meets the requirements of the Act'." *Kittitas Conservation* II, 2008 WL 1766717, at *7, 2008 GMHB LEXIS 21, at *17 (alteration in original) (quoting *Kittitas Conservation* I, 2007 WL 2729590, at *11, 2007 GMHB LEXIS 89, at *30). Petitioners challenge this finding.

¶21 Petitioners point to community testimony and to goals, policies, and objectives (GPOs) in the Plan (specifically GPOs 8.1, 8.3, 8.5, 8.9, 8.13, 8.27, 8.28, 8.30, and 8.49) as evidence of a written record that explains GMA compliance and goal harmonization. *See* Ord. 2006-63 (Plan) at 160-66 (1 AR at 215-21). With the exception of GPO 8.3, which states that "[s]prawl will be discouraged if public services and public facilities . . . are limited to just those necessary to serve the developed area boundaries," explaining how GPO 8.1 harmonizes the goals and meets the requirements of the GMA, none of the other citations by Petitioners do the same work. *Id.* at 161 (1 AR at 216). For example, GPO 8.5 reads, "Kittitas County recognizes and agrees with the need for continued diversity in densities and uses on Rural Lands." *Id.* Except to agree with state

law, this statement does not explain how the Plan's rural element actually meets the requirement of the GMA to provide for a variety of rural densities. The community testimony evinces support for three-acre rural densities but at no point articulates, nor does the County elsewhere explain, how that planning outcome harmonizes the goals or meets the requirements of the GMA.

¶22 The GMA is clear that, to the extent counties consider local circumstances in planning the rural element of their comprehensive plans, they must develop some kind of written explanation. The County does not dispute that it considered local circumstances. Looking then to the record before the Board, even with great deference to the County, there simply is no written explanation that articulates how the County's rural element harmonizes the goals and meets the requirements of the GMA. The significance of the County's failure to develop an explanation of local circumstances is strongly felt, as we weigh other issues about which we and the Board would have benefited from additional information and analysis of local circumstances. As such, we find that the Board accurately interpreted and applied the law and that its decision was supported by substantial evidence and was not arbitrary and capricious. We affirm the Board's findings and orders that the County violated the GMA by failing to develop the required written record and that the County must now comply.

III.  Boards May Not Rely on Bright Line Rules Regarding Rural Densities

¶23 Boards, as adjudicative entities, cannot make or use bright line rules to delineate between urban and rural densities. *Gold Star Resorts, Inc. v. Futurewise,* 167 Wn.2d 723, 734-35, 222 P.3d 791 (2009) (citing *Thurston County,* 164 Wn.2d at 357-60). "Whether a particular density is rural in nature is a question of fact based on the specific circumstances of each case." *Thurston County,* 164

Wn.2d at 359. In this case, the Board found that the County violated the GMA by allowing for a rural density of one dwelling unit per three acres. Petitioners argue that, in reaching this conclusion, the Board erred by applying a bright line rule. Because the County failed to develop a written record explaining how its planning decisions, taking into account local circumstances, comply with the GMA, we do not reach an answer on this question. Instead, we remand this question for reconsideration by the Board once the County supplies necessary local information.

¶24 The parties do not dispute the clear rule that boards may not apply a bright line standard, only whether the Board actually relied on one in this case. In its decision, the Board emphasized the lack of a written record provided by the County and found:

> The Petitioners in this case have shown through definitions, expert opinion, statutes, and past court and board decisions that 1 [dwelling unit]/3 acre zoning allowed in the County is more urban-like in nature and violates the GMA. This is not a "bright line" definition as the Respondent and Intervenors would like us to find, rather it is the end-result of an accumulation of quantitative data which points to an appropriate lot size for rural development.

*Kittitas Conservation* II, 2008 WL 1766717, at *7, 2008 GMHB LEXIS 21, at *17-18. Looking to the record before the Board, we find very little local data. The issue is framed from the outset as a bright line question: "Does Kittitas County's failure to . . . eliminate densities greater than one dwelling unit per five acres in the rural area . . . violate [various provisions of the GMA]?" *Kittitas Conservation* I, 2007 WL 2729590, at *4, 2007 GMHB LEXIS 89, at *9. RIDGE presented sparse local data to the Board and instead focused mostly on studies of land use in other counties and states, academic articles, and density decisions in other jurisdictions.

¶25 Petitioners responded with little relevant local information. As we discussed, the community testimony in support of three-acre rural designations generally does not address the preservation of rural character but rather emphasizes the nonagricultural economic needs of farm owners. There is no discussion of whether the density is consistent with rural character and only minimal discussion of the potential benefit that allowing farms to profit in the short-term from the division and development of small parts of their land will help preserve the rural area in the long run. The County also identifies a unique local problem of "rural sprawl," essentially untended weed patches that result from requiring larger-than-desired lot sizes in rural areas.[4] Ord. 2006-63 (Plan) at 160 (1 AR at 215). The County, however, fails to explain how three-acre rural designations, while responsive to identified community concerns, also protect rural areas. As a result, it is unclear how three-acre rural density designations are appropriate in the County's rural area, when there is substantial evidence that they are harmful to rural areas in other communities.

¶26 We reaffirm that questions of appropriate rural densities are fact specific to local communities and that boards may not rely on bright line rules regarding density. The Board appears to have relied on such a rule here. However, because the County failed to develop a written record explaining its consideration of local circumstances in planning its rural element, we decline to simply vacate the Board's finding regarding three-acre densities as a bright line rule. While parties that challenge county planning decisions bear the burden to show that a county erred in planning, RCW 36.70A.320(2), counties have some responsibility to assure that local data is considered by the Board,

---

[4] The County notably means something different by "rural sprawl" than the sprawl referred to in the GMA. The GMA seeks to reduce "sprawling, low-density development in the rural area," RCW 36.70A.070(5)(c)(iii), while the County suggests increased development will help mitigate its sprawl.

RCW 36.70A.070(5)(a). We therefore remand to the Board to reconsider the fact-intensive issue of rural density, recognizing the unique qualities of the County, once the County has complied with GMA requirements, consistent with this decision.

IV. The Board Properly Found that the County Violated the GMA by Failing To Protect Rural Character in Rural Areas

¶27 The GMA requires that counties' comprehensive plans include provisions that protect rural areas, stating in relevant part that

> [t]he rural element shall include measures that apply to rural development and protect the rural character of the area, as established by the county, by:
>
> (i) Containing or otherwise controlling rural development;
>
> (ii) Assuring visual compatibility of rural development with the surrounding rural area;
>
> (iii) Reducing the inappropriate conversion of undeveloped land into sprawling, low-density development in the rural area.

RCW 36.70A.070(5)(c). The Board found that the County's Plan and several of its development regulations fail to protect rural character. Petitioners appealed the decision regarding the Plan and three regulatory chapters. We hold that the Board properly found that the Plan lacks required provisions to protect rural areas; we do not reach the challenged development regulations.

¶28 Neither our holding nor the Board's findings should be interpreted as suggesting that Kittitas County is not rural enough. Through the GMA, the legislature sought to minimize "uncoordinated and unplanned growth," which it found to "pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state." RCW 36.70A.010. The GMA provides counties with the discretion to designate an area as rural or to designate

it differently to allow for increased growth and development. However, where a county, in its discretion, *opts* to designate land as part of its rural element, it must protect the character of the land as required by RCW 36.70A.070(5)(c).

¶29 The County's rural element includes several GPOs (specifically GPOs 8.1, 8.3, 8.5, 8.9, 8.13, 8.27, 8.28, 8.30, and 8.49), which Petitioners argue function to protect rural character. For example:

> GPO 8.9 Projects or developments which result in the significant conservation of rural lands or rural character *will be encouraged.*
>
> GPO 8.13 Methods other than large lot zoning to reduce densities and prevent sprawl *should be* investigated.

Ord. 2006-63 (Plan) at 162 (1 AR at 217) (emphasis added). The cited GPOs almost exclusively employ conditional rather than directive language and fall short of ensuring the protection of rural areas, as required by RCW 36.70A.070(5)(c). It is further instructive that the Plan's executive statement expressly acknowledges the Plan's limited reach, stating that "it contains no regulations or minimum standards." *Id.* at 1 (1 AR at 56). It goes on to state:

> There is no assurance . . . that orderly development or any of the other goals will be accomplished simply by the formal adoption of the Plan. The value of the Plan lies in the determination and commitment of the County in the future to implement the Plan through the adoption of ordinances and codes designed to achieve the stated objectives.

*Id.* While the GPOs suggest that the County and its development regulations *should* address the requirements of the GMA, they simply do not require or assure as much.

¶30 Petitioners argue that certain development regulations, including limitations on the amount of rural land to be zoned at the highest densities and rezone criteria, satisfy the required GMA measures. *See* KITTITAS COUNTY CODE

(KCC) 17.04.060; KCC 17.98.020(7). While it is unclear whether the regulations Petitioners cite do all the work they suggest,[5] the presence of protective measures in the zoning regulations is irrelevant because the statutory language of the GMA is clear that protective measures *shall* be included in the Plan. RCW 36.70A.070(5)(c).

¶31 The GMA requires deference to local government determinations regarding what measures will best protect rural character but is clear that plans must actually include such measures.[6] The record before the Board establishes that the portions of the Plan relating to the protection of rural areas almost exclusively consist of aspirational principles, not imperatives. As such, the Plan violates the GMA by failing to include required measures that protect rural areas.

¶32 County development regulations must also comply with the requirements of the GMA. *See* RCW 36.70A-.130(1)(a) ("a county or city shall . . . ensure the plan and regulations comply with the requirements of this chapter"). Also for failure to protect rural areas, the Board found that the County's development regulations regarding performance based cluster platting, ch. 16.09 KCC; designated "agricultural (A-20)" rural zones, ch. 17.29 KCC; and planned unit developments (PUDs), ch. 17.36 KCC, violate

---

[5] The cap on higher density rural designations still allows the majority of the County's rural area to be zoned at the highest densities. The cap limits rural three- and five-acre densities to 16 percent of "overall land mass available in Kittitas County." KCC 17.04.060. The County's rural area constitutes 24 percent of the land in the County. Carried out, over 66 percent of the rural area could be designated at the highest rural densities. Additionally, Petitioners' reference to the County's rezoning criteria as a protective measure, in place of specific protections in the Plan, is somewhat disingenuous. While there are other criteria with varying levels of specificity, the first criterion for a rezone is compatibility with the Plan. KCC 17.98.020(7)(a). Without protections for rural areas in the Plan, this is a meaningless criterion.

[6] The dissent makes an analogy comparing a comprehensive plan to a blueprint for a house and development regulations to the brick and mortar. Concurrence/ dissent (J.M. Johnson, J.) at 202. This analogy oversimplifies the regulation of land use in our state but, even accepting it, we note that the legislature has clearly required that certain elements be included in the blueprint (or the Plan) itself, including protection of rural character.

the GMA. Petitioners appealed these decisions and argue that these regulations are permitted because the GMA specifically provides that counties may implement innovative zoning techniques in rural areas. *See* RCW 36.70A-.070(5)(b). We withhold judgment on these regulations and remand to the Board to reconsider after the County complies with the GMA by including protections of rural areas in its Plan.

¶33 The Board found that the regulations allow nonrural densities and uses in rural areas. Specifically, regarding the County's cluster platting regulation, ch. 16.09 KCC, the Board was troubled that it "does not include a limit on the maximum number of lots allowed on the land included in the cluster; prohibit the number of connections to public and private water and sewer lines; nor include requirements to limit development on the residual parcel." *Kittitas Conservation* I, 2007 WL 2729590, at *34, 2007 GMHB LEXIS 89, at *94; *see Kittitas Conservation* II, 2008 WL 1766717, at *9, *36, 2008 GMHB LEXIS 21, at *22, *98. Petitioners argue that the County uses clustering as expressly envisioned by the GMA, RCW 36.70A.070(5)(b), and point to several protections, including a prohibition of prospective use with the PUD ordinance, established minimums for open space allocation, and procedural safeguards, including evaluation of impacts on adjacent uses and optional attachment of conditions, *see, e.g.*, KCC 16.09.030, .040(D), (E).

¶34 The Board also found that the County's A-20 agricultural zone violates the GMA by allowing for conditional use permits and one-time lot splits. *See* KCC 17.29.030, .040. Despite its name, this zone is a rural designation. The Board stated:

> [I]f the County has standards in place to keep intact rural character and limit the size of development, some of the uses might be permissible in the rural area, such as kennels and agricultural-related auctions and museums. However, that's not the case here. In this case, the County failed to provide the

necessary standards and limitations in its regulations to ensure urban-type uses will not be conditionally permitted or administratively decided in the rural area. . . .

. . . .

. . . The Board agrees with the County that a one-time split may be an allowable "innovative technique", but only if it conforms to the GMA statutes mentioned, does not exceed the permitted density, or create non-conforming lots.

*Kittitas Conservation* II, 2008 WL 1766717, at \*12, \*26, 2008 GMHB LEXIS 21, at \*31, \*72. To the extent the Board implies here that only innovative techniques that match underlying density designations are permissible under the GMA, the Board errs. The GMA contemplates use of zoning techniques that may result in some higher densities (e.g., clustering) so long as they "are not characterized by urban growth." RCW 36.70A.070(5)(b), .030(19).

¶35 Finally, the Board found that chapter 17.36 KCC, regulating PUDs, violates the GMA by failing to protect rural character. *See Kittitas Conservation* II, 2008 WL 1766717, at \*13, 2008 GMHB LEXIS 21, at \*34. PUDs are developments "in which a mixture of land uses are permitted including residential, commercial, and open space, the plan for which may not correspond in lot size, density, or type of dwellings to other zoning districts." KCC 17.08.450. The Board found fault because "KCC 17.36 allows commercial uses, such as hotels, motels, restaurants, cafes, taverns and other businesses in the rural area." *Kittitas Conservation* II, 2008 WL 1766717, at \*13, 2008 GMHB LEXIS 21, at \*33.

¶36 We decline to reach a decision regarding each challenged regulatory chapter because the issues are too entwined with the overarching lack of protection of rural areas in the Plan, as well as its failure to develop a written record explaining local circumstances. The GMA allows for use of innovative zoning techniques, even those that may increase densities above the underlying rural designation. RCW 36.70A.070(5)(b). However, there must be some pro-

tections in place to limit development so it is consistent with rural character and not characterized by urban growth. *Id.* In our view, compliance with the GMA's requirement to include provisions that protect rural character in the Plan *may* save the challenged zoning regulations. We leave that to later determination by the Board.

V.   The Board Properly Found that the County's Plan Fails To Provide for a Variety of Densities

¶37 Among other required provisions in the rural element of a comprehensive plan, the GMA states that "[t]he rural element shall provide for a variety of rural densities." *Id.* The Plan does not directly include a variety of rural densities but instead allows the zoning code to designate densities, which has effectively resulted in a variety of densities in the rural area, including one dwelling unit per 3, 5, and 20 acres. Ord. 2006-63 (Plan) at 5 (1 AR at 60) (describing *existing* land uses); *see* 1 AR at 1097 (land use map with one rural designation), 1099 (zoning map with several assigned rural designations).[7] The parties dispute whether the GMA is satisfied by reference in the Plan to zoning regulations that have included six possible designations (with three possible densities) and innovative zoning techniques or whether the Plan itself must include some designations or other language to directly and prospectively provide for a variety of rural densities.

¶38 This issue comes down to a question of law: What does it mean that counties "shall provide for a variety of rural densities" in their comprehensive plans? RCW 36.70A-.070(5)(b). The plain meaning of "provide for" could be disputed, meaning either "to make a proviso or stipulation," *Webster's Third New International Dictionary* 1827 (2002), or "to furnish the means of support . . . [;] to prepare . . . some

---

[7] The concurrence/dissent (J.M. Johnson, J.) also cites GPO 8.5: "Kittitas County recognizes and agrees with the need for continued diversity in densities and uses on Rural Lands." Ord. 2006-63 (Plan) at 161 (1 AR at 216). As we previously noted, this GPO expresses agreement with state law but does nothing to implement it.

probable or possible situation" (i.e., to allow for something to happen or exist), *Webster's New Twentieth Century Dictionary, Unabridged* 1450 (2d ed. 1960). The former meaning seems most appropriate in the context of the entire GMA. *See Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 10-12, 43 P.3d 4 (2002) (concluding that the court should consider the context of the entire act when interpreting the plain meaning of statutory text). This provision that counties "shall provide for a variety of rural densities" is situated within one of the mandatory elements of comprehensive planning under the GMA. RCW 36.70A.070(5)(b). Additionally, the GMA distinguishes between when a County "shall provide for" and "may provide for" something. For example, the statute uses the phrase "shall provide for" regarding the requirements for public participation in local planning, which surely is not optional. *See, e.g., King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 138 Wn.2d 161, 176, 979 P.2d 374 (1999) (noting that "counties are required to 'provid[e] for early and continuous public participation' " (alteration in original) (quoting RCW 36.70A.140)).

¶39 As this court has noted, "the GMA does not dictate a specific manner of achieving a variety of rural densities." *Thurston County*, 164 Wn.2d at 360. In *Thurston County*, the Western Washington Growth Management Hearings Board invalidated several of that county's rural designations and then also faulted it for not providing a variety of rural densities. This court remanded to that board to determine whether innovative zoning techniques were sufficient to provide for a variety of rural densities, observing that "[t]he use of innovative techniques may be sufficient, regardless of the underlying zoning classifications, to achieve a variety of rural densities." *Id.* The Thurston County plan, unlike the County's Plan, included distinct rural designations. *Id.* at 338-39. In any event, the question of what, if anything, must be in a comprehensive plan regarding a variety of rural densities is now squarely before

the court. A plain reading of the statute indicates that the Plan itself must include something to assure the provision of a variety of rural densities.

¶40 We also note a practical concern raised by RIDGE and CTED. They argue that reading the GMA to not require that the Plan itself provide for a variety of rural densities will result in the evasion of GMA requirements through site-specific rezones. This is not the first time this court has recognized this potential problem. *See Woods v. Kittitas County*, 162 Wn.2d 597, 629-32, 174 P.3d 25 (2007) (Becker, J., concurring). Because interested parties cannot raise GMA compliance issues in Land Use Petition Act (ch. 36.70C RCW) petitions, *id.* at 616 (majority opinion), site-specific rezones are evaluated only for compliance with the GMA through evaluation of their consistency with the existing Plan. A comprehensive plan that is silent on the provision of a variety of rural densities (and other protective measures for rural areas) effectively allows rezones that circumvent the GMA. This argument may prove too much, as rezones must also comply with development regulations, which can be challenged for compliance with the GMA. *Id.* at 615-16 (majority opinion). However, in *Woods*, the petitioner's land was designated at one dwelling unit per 20 acres, and the County later approved a 3-acre rezone after it was too late for her to challenge the development regulations for compliance with the GMA. *Id.* at 629-30 (Becker, J., concurring) ("The rezone was the first and only time that the actual change of density on the subject site could have been challenged . . . as violating the GMA."); RCW 36.70A.290(2) (stating that petitions challenging a comprehensive plan or development regulation as noncompliant with the GMA "must be filed within sixty days after publication"). While we decide this question on the basis of the plain statutory language, we recognize that reading out the requirement that counties include certain protections *in* the Plan itself, including to provide for a variety of rural densities, could result in the evasion of GMA requirements through site-specific rezoning.

¶41 There is substantial evidence in the record that was before the Board that nothing in the Plan directly and prospectively assures a variety of rural densities. We find that the County must include something in its Plan that provides for a variety of rural densities.

VI.  The Board Properly Found that the County Allows Impermissible Uses in a Designated Agricultural Area

¶42 The County's commercial agricultural zone is regulated by chapter 17.31 KCC. As with rural lands, the GMA allows for use of innovative zoning techniques in agricultural areas and does not limit such techniques to the statutorily enumerated examples. RCW 36.70A.177. Despite that, the Board found that the allowance by chapter 17.31 KCC for one-time lot splits and a variety of conditional uses, *see* KCC 17.31.030, .040, violates the GMA's requirement to protect agricultural land. Petitioners appealed. We find the Board's decision to be an accurate application of our decision in *Lewis County* and therefore affirm the Board on this issue.

¶43 Regarding one-time splits, chapter 17.31 KCC includes a lot size requirement that limits division to two lots per 10 acres and also provides that "[o]nce this provision has been applied to create a new parcel, it shall not be allowed for future parcel subdivision, while designated commercial agriculture." KCC 17.31.040(1). Regarding conditional uses, many enumerated uses—including, for example, nonlivestock auctions, quarries and sand and gravel excavation, and kennels—are allowed by permit if the County's Board of Adjustment determines that

> the proposed use is essential or desirable to the public convenience and not detrimental or injurious to the public health, peace, or safety or to the character of the surrounding neighborhood [and] will not be unreasonably detrimental to the economic welfare of the county and that it will not create excessive public cost for facilities and services.

KCC 17.60A.010. While the Board acknowledged that "[t]here are uses presently allowed by the County that may

be appropriate for the [agricultural lands of long term commercial significance], if their scope and/or function are limited," the Board concluded that the County "impermissibly allows urban uses on its agricultural lands of long-term significance, and fails to include standards within its development regulations to limit such uses and protect the commercial agricultural zone," as required by the GMA. *Kittitas Conservation* II, 2008 WL 1766717, at *15-16, 2008 GMHB LEXIS 21, at *42-44.

¶44 This court held in *Lewis County* that, while a board must consider local industry needs, the Western Washington Growth Management Hearings Board "did not err by invalidating the ordinances that . . . allowed nonfarm uses within designated agricultural lands." 157 Wn.2d at 493-94. The court noted that the problem was "that *any* farmer could convert *any* five acres of farmland to more profitable uses, even if such conversion would remove perfectly viable fields from production." *Id.* at 505. While the County has a permitting process in place, the criteria for approving conditional uses on agricultural land do not relate to the conservation of agricultural lands or encourage the *agricultural* economy. *See* RCW 36.70A.177(1) ("The innovative zoning techniques should be designed to conserve agricultural lands and encourage the agricultural economy."). In *Lewis County*, the court determined that despite the GMA's allowance for innovative techniques, the GMA requires that agricultural lands be protected. 157 Wn.2d at 508-09; *see King County*, 142 Wn.2d at 560 ("In order to constitute an innovative zoning technique consistent with the overall meaning of the [GMA], a development regulation must satisfy the [GMA]'s mandate to conserve agricultural lands for the maintenance and enhancement of the agricultural industry.").

¶45 In this case, the Board noted that chapter 17.31 KCC allows activities that "remove the land from agricultural production for many years, if not forever." *Kittitas Conservation* II, 2008 WL 1766717, at *15, 2008 GMHB

LEXIS 21, at *42. The Board appropriately applied the rule from *Lewis County*, and the record includes substantial evidence that the County has no protections in place to protect agricultural land from harmful conditional uses. Like in *Lewis County*, the Board's invalidation of the County's regulation does not strip the County of its ability to use innovative techniques but, rather, assures the "county's zoning methods are actually 'designed to conserve agricultural lands and encourage the agricultural economy.'" *Lewis County*, 157 Wn.2d at 507-08 (quoting RCW 36.70A.177(1)). We therefore find that the Board accurately interpreted and applied the law, acting on substantial evidence and not arbitrarily or capriciously. We affirm the Board's finding that chapter 17.31 KCC is not compliant with the GMA.[8]

VII.   The Board Improperly Found that the County's Airport Zone Is Noncompliant with the GMA

¶46 Petitioners, in particular intervenor Son Vida II, argue that the Board erred by finding that chapter 17.58 KCC, regulating the County's airport overlay zone, violates the GMA by failing to implement land use restrictions that assure adequate safety precautions. *See* RCW 36.70A-.070(1) (requiring, where appropriate, that the County's land use element address general aviation airports). Son Vida II argues that the doctrine of stare decisis prevents the Board from considering issues of density within the airport overlay zone and, alternatively, that the Board's finding is improper. We disagree that stare decisis precluded consideration of this issue but find that the Board failed to give proper deference to the County's planning decision under the relevant statutes.

¶47 Son Vida II, a property owner in the Kittitas County and Ellensburg airport overlay zones, wrongly argues the

---

[8] The concurrence/dissent (J.M. Johnson, J.) takes issue with this remedy and argues for remanding to the County. We note, however, that the County may still revise the regulation to come into compliance with the GMA; the statutory scheme provides for such revision upon a board's finding of invalidity. RCW 36.70A.302(7).

doctrine of stare decisis. Son Vida II previously challenged whether Ordinance 2001-10, which amended the Kittitas County airport zone, violated the GMA by reducing the densities allowed in parts of the Ellensburg urban growth area to nonurban densities. *See Son Vida II v. Kittitas County*, No. 01-1-0017, 2002 WL 32065595 (E. Wash. Growth Mgmt. Hr'gs Bd. Mar. 14, 2002). The Board then concluded the regulation did not violate the GMA. 2002 WL 32065595, at *13. Son Vida II now argues that, because the Board essentially held that the regulation complied with the GMA, the doctrine of stare decisis limits the Board's authority in this case. We disagree.

¶48 Stare decisis "means no more than that the rule laid down in any particular case is applicable only to the facts in that particular case or to another case involving identical or substantially similar facts." *Floyd v. Dep't of Labor & Indus.*, 44 Wn.2d 560, 565, 269 P.2d 563 (1954) (emphasis omitted). While there are other relevant considerations, such as whether the doctrine of stare decisis even applies to boards as quasi-judicial agencies,[9] stare decisis does not apply in the way Son Vida II suggests because the parties and issues are different. Stare decisis does not prevent another party from petitioning a court for consideration of how previously decided law applies to the new party's facts. In the GMA context, this court has specifically recognized the authority of boards to review new challenges to comprehensive plans or development regulations if they have recently been modified or if the County declines to revise them but the GMA has been amended since the last review. *Thurston County*, 164 Wn.2d at 344. Because the County modified the airport overlay zone by extending previous regulations that applied to Bowers Field to all airports in the County, *see* Ord. 2007-22 (2 AR at 8-16); KCC 17.58.040A, .040B, RIDGE's petition was properly

---

[9] "Although stare decisis plays only a limited role in the administrative agency context, agencies should strive for equality of treatment." *Vergeyle v. Dep't of Emp't Sec.*, 28 Wn. App. 399, 404, 623 P.2d 736 (1981).

reviewable by the Board. The issues and the parties are different: Son Vida II previously challenged whether the densities were too low, whereas RIDGE now alleges that the densities are too high. Any implication in the *Son Vida II* case of 2002 that the airport zone was compliant under the GMA against *any* challenge was merely dictum because only the narrow question of whether the permitted densities were too low to comply with the GMA was before the Board.

¶49 While boards should be consistent in their holdings, *see* RCW 34.05.570(3)(h) (providing as grounds for reversal of an agency decision that its "order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency"), stare decisis does not preclude this challenge.

¶50 The question properly before the Board was whether the County's failure to prohibit residential uses and higher-than-recommended densities by the Washington State Department of Transportation (WSDOT) violates the GMA. The GMA subjects county land use planning affecting general aviation airports to RCW 36.70.547, which states that a county "shall, through its comprehensive plan and development regulations, discourage the siting of incompatible uses adjacent to such general aviation airport." RCW 36.70A.510. The Board found that, because the County's regulation diverges from WSDOT recommendations for land use near airports, the County's regulation violates the GMA. We disagree and find that the Board should have deferred to the County.

¶51 The County's regulation differs from WSDOT recommendations by allowing higher densities and not flatly prohibiting residential uses in certain safety zones. *See Kittitas Conservation* II, 2008 WL 1766717, at *31, 2008 GMHB LEXIS 21, at *84. The Board gave substantial weight to WSDOT's recommendations. 2008 WL 1766717, at *32, 2008 GMHB LEXIS 21, at *87. The Board, however,

is supposed to give deference to the County unless the County clearly erred. RCW 36.70A.320(3). The statutory scheme requires only that counties "discourage" incompatible uses. RCW 36.70.547. Discouragement is not the same as prohibition. The County clearly did not follow all of WSDOT's recommendations. While this may be imprudent, the statutory scheme does not suggest that counties *must* follow the advice of WSDOT. Considering the loose statutory language and the requirement of boards to defer to counties' planning choices, the record before the Board does not establish firmly and definitely that the County erred.

VIII. The Board Properly Found that the County's Subdivision Regulations Fail To Protect Water Resources as Required by the GMA

¶52 The GMA includes requirements that counties consider and address water resource issues in land use planning. *See, e.g.*, RCW 36.70A.020(10) (GMA goal to protect the environment, including "water quality[ ] and the availability of water"), .070(1) (requiring that land use elements "shall provide for protection of the quality and quantity of groundwater used for public water supplies"), (5)(c)(iv) (requiring that rural elements include measures "[p]rotecting . . . surface water and groundwater resources"). RIDGE challenged whether provisions of the County's subdivision code, Title 16 KCC, violated the water protection requirements of the GMA. The Board found that they did, holding "that the County's subdivision regulations allow multiple subdivisions side-by-side, in common ownership, which then can use multiple exempt wells . . . contrary to the GMA's requirements to protect water quality and quantity." *Kittitas Conservation* II, 2008 WL 1766717, at *18, 2008 GMHB LEXIS 21, at *49-50. The Board's conclusion results from connecting the GMA's mandates to protect water with this court's interpretation of RCW 90.44.050 in *Campbell & Gwinn*, 146 Wn.2d at 4, that the total group groundwater use in a residential development must be considered, rather

than the separate use of each residential lot, for purposes of determining if use is in excess of 5,000 gallons per day for permit exemption. *Kittitas Conservation* II, 2008 WL 1766717, at *18-19, 2008 GMHB LEXIS 21, at *49-50. Petitioners argue that the Board's finding is outside its jurisdiction and, even if not, that the Board erred. We disagree and affirm the Board's finding that the County's subdivision regulation violates the GMA.

¶53 The Board has jurisdiction to hear petitions alleging a county's development regulations are not compliant with the GMA. RCW 36.70A.280(1)(a). Because the GMA includes requirements to protect water, the Board has statutory authority to hear petitions that challenge whether development regulations violate those GMA provisions that require a county to address water issues in its land use planning. *See Swinomish Indian Tribal Cmty. v. Skagit County*, 138 Wn. App. 771, 780, 158 P.3d 1179 (2007) (noting that the tribe may seek relief, regarding water well issues, "from the Growth Management Hearing's [sic] Board regarding new ordinances adopted by the County to comply with the . . . GMA, or seek such relief regarding a failure to adopt appropriate ordinances").

¶54 Having noted the Board's jurisdiction, we then look to the substance of its decision. Chapter 16.04 KCC, the specific subdivision regulation challenged by RIDGE, provides in part:

> Any person desiring to subdivide the land in an unincorporated area of the county shall submit a preliminary plat (see Chapter 16.12) to the director which shall be accompanied by filing fees established annually by the board of commissioners under separate action.

KCC 16.04.040. Chapter 16.12 KCC requires disclosure of the owner(s) and information about abutting property owners but not disclosure of related subdivision applications. *See* KCC 16.12.020. Primarily as a matter of law, RIDGE argued that the County is required to assure that "all land

within a common ownership or scheme of development be included within one application for a division of land" in order to comply with the GMA's requirements to protect water. *Kittitas Conservation* II, 2008 WL 1766717, at *16, 2008 GMHB LEXIS 21, at *44. The record before the Board included evidence of water shortages in the county and subdivision applications that allegedly evade the law under this court's interpretation of RCW 90.44.050 (requiring a permit to withdraw groundwater) in *Campbell & Gwinn* by relying on multiple exempt wells. 2008 WL 1766717, at *17, 2008 GMHB LEXIS 21, at *45.

¶55 In *Campbell & Gwinn*, this court interpreted the permit exemption of RCW 90.44.050 and held that commonly owned developments are not exempt and therefore must comply with the established well permitting process if the total development uses more than 5,000 gallons of water per day. 146 Wn.2d at 4. The case did not directly address the impact of the holding on county planning or land use decisions, noting only that "[amici] urge that [the GMA] planning duties will be hindered if the exempt well provision does not apply to multiple wells in a development." *Id.* at 18 n.9.

¶56 Primarily relying on the water protection provisions of the GMA and *Campbell & Gwinn*, the Board concluded that chapter 16.04 KCC fails to assure that authorized subdivisions do not contravene or evade water permitting requirements. The County's allowance for multiple, separately evaluated subdivision applications for properties that are all part of the same development tacitly allows subdivision applicants to evade this court's rule in *Campbell & Gwinn*. In effect, the County could approve the subdivision of land, relying on the availability of permit-exempt wells for water supply, under circumstances in which *Campbell & Gwinn* would actually require water permits from the Department of Ecology under RCW 90.44.050. Petitioners argue that the Board misinterpreted the relevant law. We disagree and hold that the Board

correctly interpreted and applied the law when it found that the County's subdivision regulation violates the GMA by failing to protect water resources.

¶57 At times, Petitioners seem to argue that the County is entirely preempted from adopting regulations related to the protection of groundwater resources, authority it suggests rests entirely with Ecology. Ecology disagrees with Petitioners on this point, and, because Ecology is the primary administrator of chapter 90.44 RCW, the court gives great weight to its interpretation of that chapter. *See Port of Seattle v. Pollution Control Hearings Bd.*, 151 Wn.2d 568, 594, 90 P.3d 659 (2004). Petitioners specifically cite RCW 90.44.040, which provides:

> Subject to existing rights, all natural groundwaters . . . are hereby declared to be public groundwaters and to belong to the public and to be subject to appropriation for beneficial use under the terms of this chapter and *not otherwise*.

(Emphasis added.) While this provision preempts the County from separately *appropriating* groundwaters, it does not prevent the County from protecting public groundwaters from detrimental land uses. Nothing in the text of chapter 90.44 RCW expressly preempts consistent local regulation. *See State v. Kirwin*, 165 Wn.2d 818, 826, 203 P.3d 1044 (2009) (noting that, while the court considers the purpose and the facts and circumstances surrounding a statute, the court " 'will not interpret a statute to deprive a municipality of the power to legislate on a particular subject unless that clearly is the legislative intent' " (internal quotation marks omitted) (quoting *HJS Dev., Inc. v. Pierce County*, 148 Wn.2d 451, 480, 61 P.3d 1141 (2003))).

¶58 In fact, several relevant statutes indicate that the County *must* regulate to some extent to assure that land use is not inconsistent with available water resources. The GMA directs that the rural and land use elements of a county's plan include measures that protect groundwater resources. RCW 36.70A.070(1), (5)(c)(iv). Additional GMA

provisions, codified at RCW 19.27.097 and 58.17.110, require counties to assure adequate potable water is available when issuing building permits and approving subdivision applications. *See Swinomish Indian Tribal Cmty.*, 138 Wn. App. at 780 ("We agree that the County is legally required to follow the dictates of [RCW 19.27.097].".). Specifically regarding subdivisions, RCW 58.17.110(2) provides:

> A proposed subdivision and dedication shall not be approved unless the city, town, or county legislative body makes written findings that: (a) Appropriate provisions are made for . . . potable water supplies.

Finally, without comment on the adequacy of its provisions, we note that the County has in fact adopted regulations related to water use.[10] We conclude that the County is not precluded and, in fact, is required to plan for the protection of water resources in its land use planning.

¶59 Petitioners also argue that the County's subdivision regulations need not require disclosure of adjoining subdivision applications because the recording act, Title 65 RCW, already makes available common ownership as a public record. Next, Petitioners argue that even if the County collected common ownership information in its subdivision application process, Ecology, not the County, is designated to enforce the permitting process for groundwater use. As such, Petitioners argue that the County cannot and is not required to deny subdivision applications on the basis of the *legal* availability of groundwater. The parties dispute whether the requirement of RCW 58.17.110 that counties assure appropriate provisions are made for potable water

---

[10] *See, e.g.*, Ord. 2006-63 (Plan) at 9-10 (1 AR at 64-65) (water rights), 165, GPO 8.46 (1 AR at 220) ("Residential development on rural lands must be in areas that can support adequate private water and sewer systems."), 166, GPO 8.49 (1 AR at 221) ("Lot size should be determined by provision for water and sewer."); *see also* former KCC 16.09.010 (2006) (2 AR at 21) (stating the purpose of cluster platting as, in part, "to conserve water resources" by minimizing the development of exempt wells); KCC 17.36.040(3) (requiring a PUD final plan to include "[c]ertification from state and local health authorities that water and sewer systems are available to accommodate the development").

supplies means only that counties must assure that water is factually available underground or that water is both factually and legally available.

¶60 While Ecology is responsible for appropriation of groundwater by permit under RCW 90.44.050, the County is responsible for land use decisions that affect groundwater resources, including subdivision, at least to the extent required by law. In recognizing the role of counties to plan for land use in a manner that is consistent with the laws regarding protection of water resources and establishing a permitting process, we do not intend to minimize the role of Ecology. Ecology maintains its role, as provided by statute, and ought to assist counties in their land use planning to adequately protect water resources. We note that the record demonstrates that Ecology in fact communicated with the County about concerns regarding the availability of water during its planning process.

¶61 Without a requirement that multiple subdivision applications of commonly owned property be considered together, the County cannot meet the statutory requirement that it assure appropriate provisions are made for potable water supplies. Instead, nondisclosure of common ownership information allows subdivision applicants to submit that appropriate provisions are made for potable water through exempt wells that are in fact inappropriate under *Campbell & Gwinn* when considered as part of a development, absent a permit. To interpret the County's role under RCW 58.17.110 to require the County to only assure water is physically underground effectively allows the County to condone the evasion of our state's water permitting laws. This could come at a great cost to the existing water rights of nearby property owners, even those in adjoining counties, if subdivisions and developments overuse the well permit exemption, contrary to the law.

¶62 The record before the Board included information about water shortages in the County and separately considered subdivision applications that relied on permit-exempt

wells for water. However, this issue is fundamentally a question of law regarding how the GMA requires counties to protect water resources. The court gives " 'substantial weight' " to a board's interpretation of the GMA. *Lewis County*, 157 Wn.2d at 498 (quoting *King County*, 142 Wn.2d at 553). The GMA requires that counties provide for the protection of groundwater resources and that county development regulations comply with the GMA. The Board properly interpreted the GMA's mandate to protect water to at least require that the County's subdivision regulations conform to statutory requirements by not permitting subdivision applications that effectively evade compliance with water permitting requirements. We affirm this Board decision.

## CONCLUSION

¶63 This case presents multiple issues related to GMA compliance. We hold that the Board properly interpreted and applied the law in finding that the County has failed to comply with the GMA's requirements to develop a written record explaining its rural element, include provisions in the Plan that protect rural areas, provide for a variety of rural densities in the Plan, protect agricultural land, and protect water resources. We further hold that the Board did not improperly dismiss evidence. Finally, we hold that the Board improperly determined that the County's airport overlay zone is noncompliant with the GMA. Accordingly, we remand these matters to the Board for further proceedings consistent with this opinion.

MADSEN, C.J., and C. JOHNSON, ALEXANDER, FAIRHURST, and STEPHENS, JJ., concur.

¶64 CHAMBERS, J. (concurring in part and dissenting in part) — Each county is a canvas of its own shape and size and with its own unique features already embossed on its

fabric. The Growth Management Act (GMA), chapter 36.70A RCW, provides brushes and paints and encourages each county to create its own image of its future, within guidelines established by the people through their state legislature. Each county should be given the opportunity to create its own vision, a masterpiece in its own eye. The rule of law should give guidance on such general concepts as form and perspective. But if the rule of law is permitted to dictate where and how all the lines are drawn, if conformity instead of creativity is imposed by the growth management boards and the courts, then the masterpieces will begin to look like perfunctory mechanical drawings. Because I think we are developing a rule of law that stifles creativity and coerces conformity of image, I concur in part and dissent in part.

¶65 To illustrate my views, I offer to the reader several visuals of Kittitas County. The first is of a conversation among three long time residents of the county. The scene of the fictional conversation is a small café.

¶66 *Madge's jaw dropped and a look of disbelief washed across her face. Fred let out a low whistle of astonishment. Harry looked into his cup of black coffee and continued, "I know it is hard to believe, but they say Kittitas County hasn't done enough to protect its rural character or 'rural element' as they put it."*

¶67 *"Says who?" Madge demanded.*

¶68 *"Something called the 'growth management board,' set up by the folks in Olympia, that's who," answered Harry matter of factly.*

¶69 *"If they don't think the county is rural enough, then they've never laid eyes on it," declared Fred.*

¶70 *"Pin brains," added Madge.*

¶71 To understand the shock and astonishment of Madge and Fred at the thought that someone or something did not think that Kittitas County had done enough to protect its rural character, let me take the reader on a little

tour of Kittitas County. The tour will be a simple scenic drive along Interstate 90 (I-90) from west to east. We will enter Kittitas County on a mountain pass and enter the Wenatchee National Forest. It is a rugged mountain area inhabited by few souls. We will continue east through heavily forested mountains on I-90 until we descend to the hamlets of Easton and Cle Elum, where the foothills covered with fir trees stretch north to Chelan County and south to Yakima County. Except for some largely abandoned little mining towns and vacation cabins nestled close to the freeway, there are few people in this area. Passing the old mining town of Cle Elum, we will get a stunning view of Mount Stuart, part of the rugged North Cascades. Further east is Elk Heights, where we may see as many as 100 elk grazing right next to the freeway. Then the freeway levels out onto Eastern Washington's high desert plateau. The plateau is nearly 2,000 feet high, arid and covered with rock left behind by glaciers receding more than 10,000 years ago. Approaching Ellensburg, the only city of any size in Kittitas County, with a population of about 18,000, we will see some cattle ranch land. However, after passing Ellensburg, we will see nothing but miles of the stark grandeur of a land where little but sagebrush and rocks seem to grow until finally the beautiful Columbia River will come into view. The mighty Columbia River marks the eastern boundary of Kittitas County.

¶72 Kittitas County, like most Washington counties, is very, very rural. The population of the county is about 40,000. The average density of its neighbor King County is 817 people per square mile. The average density of Kittitas County is only 14.5 people per square mile.[11] With this tour behind us we will rejoin the conversation.

---

[11] These demographic facts are drawn from the Kittitas County web site and the United States Census Bureau. *See About the County*, KITTITAS COUNTY, http://www.co.kittitas.wa.us/about/ (last visited Aug. 3, 2011); *State & County QuickFacts*, U.S. CENSUS BUREAU, http://quickfacts.census.gov/qfd/states/53/53033.html (last visited Aug. 3, 2011). The travel narrative is drawn from this Justice's frequent trips back to Eastern Washington. *See also Kittitas County*,

¶73 *Harry laughs at Madge, "No, they're not pin brains. They just believe that planning for the future is a good idea. You never know when we're gonna have a land rush."*

¶74 *"Yeah right, 'land rush,'" Madge snorts.*

¶75 *After a moment, Fred pipes up, "If those folks in Olympia had the wits of rabbits, they'd figure a way to move the people in the crowded areas over here. They should balance the population by getting businesses to build factories in Kittitas County or build a big airport or something over here. But making us preserve the rural character just seems wrongheaded to me."*

¶76 *"Well," Harry continues, "as I understand it, the state legislature had a good idea to push each county to develop its own plan. The whole scheme for growth and development is overseen by state boards; there is one board just for Eastern Washington. The idea was to plan from the bottom up. The rub is that the bottom up planning is administered from the top down."*

¶77 *Madge persists, "I still think they are pin brains if they think Kittitas County isn't rural enough. What this county needs is a few more jobs."*

¶78 *Harry lets the waitress warm up his coffee before continuing, "I think they mean well, they want each county to do its own planning but then they want to treat all counties equal, so they set up uniform standards and procedures for planning and documentation that don't always make a lot of sense when counties are so different. They say they don't want cookie cutter plans but all the plans must fit through the same cookie cutters. I think the real problem is they passed laws, then judges sometimes interpret those laws with one finger on the words of the law and one finger in the dictionary, and the rule of law takes over the rule of reason."*

¶79 *Fred shakes his head, "So the good idea got lost in the details."*

*Washington*, WIKIPEDIA, www.en.wikipedia.org/wiki/kittitas_County,_Washington (last visited Aug. 3, 2011).

¶80 *"Yep," Harry says, nodding to his coffee cup, "The devil is in the details."*

THE GROWTH MANAGEMENT SCHEME

¶81 First, I disagree with Madge. The people who designed and administer the State's land use policies are far from pin brains. The legislature saw the benefit of planned, coordinated growth. Growth and development benefit by coordinating infrastructure and services with development while preserving wilderness, wet, and agricultural lands. The legislature adopted the GMA in an effort to ensure appropriate planning. The GMA is not a model of clarity. When disputes arise, as they do, as to how to give effect to the legislature's intent, courts interpret the law. We read the legislation as a whole and interpret provisions in context. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). To give the words of legislation meaning, we may resort to dictionaries. *City of Spokane ex rel. Wastewater Mgmt. Dep't v. Dep't of Revenue*, 145 Wn.2d 445, 454, 38 P.3d 1010 (2002) (citing *State v. Pacheco*, 125 Wn.2d 150, 154, 882 P.2d 183 (1994)). Generally speaking, local bodies are invited or required to develop plans, to periodically revise those plans, and to show their work. RCW 36.70A.020, .130, .215. The growth management boards review the growth management plans of counties and cities to ensure compliance with state law. RCW 36.70A.250. At least in concept, it is a good scheme.

DEFERENCE

¶82 Second, I generally agree with Fred and Justice J.M. Johnson's dissent[12] that the legislature acted with the belief that each county is in the best position to assess the challenges and needs unique to each county and to develop

---

[12] I recognize that Justice J.M. Johnson has, like me, concurred in part and dissented in part. For the ease of the reader, I refer to his opinion as the dissent.

individualized plans tailored to its own county. *E.g.*, RCW 36.70A.3201. Deference to local governments is required, and the GMA sets a high standard before a local decision is overturned. "The board shall find compliance unless it determines that the action by the . . . county . . . is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). To find an action clearly erroneous, the board must be " 'left with the firm and definite conviction that a mistake has been committed.' " *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 552, 14 P.3d 133 (2000) (quoting *Dep't of Ecology v. Pub. Util. Dist. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)). Generally speaking, if the local government has made an earnest attempt to comply with the law, has followed the procedures, and has explained why it did what it did, we should not meddle.

¶83 I also agree with Justice J.M. Johnson that the ultimate responsibility for planning and implementing a county's future rests with the county. Dissent at 195. I recognize that the Eastern Washington Growth Management Hearings Board works hard to interpret and enforce the law. However, in my view, the board often relies too heavily on court decisions that, instead of establishing broad principles, merely decide the case before the court. This approach risks unnecessarily imposing onto all counties rulings based upon the unique facts of one. *See, e.g., Diehl v. Mason County*, 94 Wn. App. 645, 972 P.2d 543 (1999) (dealing with rural densities of one housing unit per 2.5 to 5 acres); *Gold Star Resorts, Inc. v. Futurewise*, 167 Wn.2d 723, 222 P.3d 791 (2009) (dealing with rural density of one unit of housing per 5 acres). Properly read, these cases do not set standards for density. They considered whether the work of the local governments and board met the statutory standards. I specifically note that the board has elevated *Tugwell v. Kittitas County*, 90 Wn. App. 1, 951 P.2d 272 (1997), far beyond the actual holding of the case for

the proposition that parcels of less than 20 acres are too small to farm. *Kittitas County Conservation v. Kittitas County*, No. 07-1-0004c, at 8 (E. Wash. Growth Mgmt. Hr'gs Bd. Aug. 20, 2007)).[13] The board did not identify where in *Tugwell* such a holding appeared, and I cannot find it. Nor would it be appropriate for a court to hold as a matter of law what parcel of land is too small to farm.[14] That is a decision we should leave to those closer to the land.

¶84 There is nothing in the governing statutes that would prevent, for example, a county from allowing farmers to sell off marginal land for cash flow purposes where the county, after due consideration, found such policy would promote agriculture and preserve the rural character of the county. I also agree with the dissent that a comprehensive plan is " 'a generalized coordinated land use *policy statement* of the governing body of a county or city that is adopted pursuant to this chapter.' " Dissent at 202 (quoting RCW 36.70A.030(4)). The development regulations are " 'the *controls* placed on development or land use activities by a county or city,' and are what actually implement the plan." *Id.* (quoting RCW 36.70A.030(7)).

AIRPORT ZONE AND CONDITIONAL USE PERMITS

¶85 I agree with both the majority and the dissent on several issues. I agree with both that the board improperly found the county's airport zone was not in compliance. Majority at 172; dissent at 191. Further, I see nothing in the

---

[13] *Available at* http://www.gmhb.wa.gov/LoadDocument.aspx?did=1057.

[14] *Tugwell* was a case about whether a county board of commissioners improperly approved a rezoning, not about when parcels of land are too small to farm. One of the issues was whether there had been enough change in the land use patterns to justify the rezone. The Court of Appeals noted in passing that "[t]he creation of small parcels, not large enough to accommodate agricultural activities, certainly demonstrates a trend toward residential development." *Tugwell*, 90 Wn. App. at 9. That is an observation about the evidence presented, not the stuff of a judicial holding. I remind my readers that not everything that appears in an opinion is a statement of law. Often, it is merely the application of the law to a particular set of facts. The whole opinion must be read to understand its holdings.

GMA that would necessarily prohibit a county from allowing conditional use permits and one-time lot splits. I read both the majority and the dissent as agreeing with my view. Majority at 165-66.[15]

### Rural Character and Multiple Rural Densities

¶86  I must concede that Fred makes a persuasive point that it seems plain "wrongheaded" for the growth management board to require a county as vast and sparsely populated as Kittitas to waste too much time and process explaining its rural character.

¶87  The overall land use scheme is a good one but the devil lurks in the details. To conclude that "there simply is no written explanation that articulates how the County's rural element harmonizes the goals and meets the requirements of the GMA," *id.* at 159, is to exalt form and procedure over reason. To state that a county populated by forest and sagebrush but few people "[v]iolated the GMA by Failing To Protect Rural Character in Rural Areas," *id.* at 162, borders on the absurd. The board and the majority are critical of the county because the county's "A-20" agricultural zone violates the GMA by allowing for conditional use permits and one-time lot splits. *Id.* at 165. The board did allow that "some of the uses might be permissible in the rural area, such as kennels and agricultural-related auctions and museums." *Kittitas County Conservation v. Kittitas County*, No. 07-1-0015, 2008 WL 1766717, at *12, 2008 GMHB LEXIS 21, at *31 (E. Wash. Growth Mgmt. Hr'gs Bd. Mar. 21, 2008). Certainly, preserving the rural character of rural areas is of great importance in counties with bountiful populations and industry. But in counties where there are few people and fewer jobs, and the only hope is growth in nonagricultural businesses, to flatly deny the option of granting conditional use permits seems inflexible

---

[15] I recognize the opinion of my dissenting colleague does not specifically reach this issue. However, I read his opinion to be consistent with this view.

and inconsistent with the GMA's vision of allowing each county to develop plans tailored to its unique circumstances and goals.

¶88 That said, I agree with the majority and the board that the county must show its work and that the act requires a county's plan to include multiple densities. Majority at 158-59. RCW 36.70A.070(5)(a) provides:

> Growth management act goals and local circumstances. Because circumstances vary from county to county, in establishing patterns of rural densities and uses, a county may consider local circumstances, but shall develop a written record explaining how the rural element harmonizes the planning goals in RCW 36.70A.020 and meets the requirements of this chapter.

¶89 Further, the act requires, "The rural element shall provide for a variety of rural densities." RCW 36.70A-.070(5)(b). The record reflects that the county was in the process of adopting additional ordinances to satisfy these requirements. I agree with the board and majority that the county must produce a written record explaining how the rural element harmonizes with the planning goals in the GMA, and the county must provide for multiple rural densities. But these requirements must be read within the scope and context of the overall growth management planning scheme. The planning is to be done locally and "in full consideration of local circumstances." RCW 36.70A.3201. The board must defer to the county unless it finds the comprehensive plan "clearly erroneous in view of the entire record." RCW 36.70A.320(3). In my view, there is nothing inconsistent with the application of the rule of law and local decision making under the law.

## WATER

¶90 Finally, I come to the issue of water. I agree wholly with the majority and the board that the county's subdivision regulations violate the GMA. Majority at 175-76. The preservation of both surface water and groundwater re-

sources is of critical concern to our state, the nation, and the world. Water that collects in the mountains of Kittitas County is for the beneficial use of not only Kittitas County but those counties that share its aquifers and surface waters. The right to use water does not depend on where the rain or snow first fell, but rather on our statutory and common law system of riparian and groundwater rights, which turn on appropriation and beneficial use under the law. *See generally* Title 90 RCW; *Lummi Indian Nation v. State*, 170 Wn.2d 247, 252, 241 P.3d 1220 (2010) (quoting 1 WELLS A. HUTCHINS, WATER RIGHTS LAWS IN THE NINETEEN WESTERN STATES 440 (1971)). The GMA explicitly requires counties to grapple with the quality and availability of water when making their plans. RCW 36.70A.020(10), .070(1), (5)(c)(iv). We have tried over the decades to protect the public right to water without being so overbearing that any time someone digs a hole down to the water table they have to get a permit. *See generally* RCW 90.44.050; *Campbell & Gwinn*, 146 Wn.2d 1. Developers, not unreasonably, have noticed that small projects do not always bear the regulatory burdens of big ones and have attempted, at least on paper, to structure their projects accordingly. *See* RCW 90.44.050 (exempting certain wells that take no more than 5,000 gallons a day of ground water); *Campbell & Gwinn*, 146 Wn.2d at 4 (upholding the Department of Ecology's decision to treat group multiple wells in a single development together for permitting purposes). The State, not unreasonably, has used a meaningful, rather than technical, approach when evaluating whether a development is really one big project imposing one big burden on the water supply or a series of small projects drawing small amounts. *Campbell & Gwinn*, 146 Wn.2d at 5-6. We have upheld this reasonable approach. *Id.* at 21. Given this history, I agree with the majority and the board that the Kittitas County Code, by design or by accident, makes it far too easy to evade meaningful review of the impact of large projects on the existing water rights of other users under chapter 90.44 RCW.

¶91 With these observations, I respectfully concur in part and dissent in part.

¶92 J.M. JOHNSON, J. (concurring in part and dissenting in part) — The legislature enacted the Growth Management Act (GMA), chapter 36.70A RCW, to allow citizens, through local governments, to cooperate and coordinate with respect to land use planning.[16] If courts permit unelected hearings boards to dictate planning requirements to elected local governments rather than provide truly deferential oversight, however, litigation rather than cooperation results. Consequently, local governments are unable to implement decisions based on their citizens' local needs and circumstances.

¶93 I agree with the majority that the Eastern Washington Growth Management Hearings Board (Board) improperly found that Kittitas County's airport zone is noncompliant with the GMA. However, I cannot agree with its remaining conclusions or its decision to remand to the Board. The Board did not give Kittitas County (County) the deference required under the GMA and our case law, leading it to the incorrect holding that the County's comprehensive plan (Plan) and development regulations are "clearly erroneous." RCW 36.70A.320(3). The majority's decision to remand to the same Board will serve to further protract and delay while not allowing the appropriate local government to govern.

---

[16] See RCW 36.70A.010, which states:

The legislature finds that uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state. *It is in the public interest that citizens, communities, local governments, and the private sector cooperate and coordinate with one another in comprehensive land use planning.* Further, the legislature finds that it is in the public interest that economic development programs be shared with communities experiencing insufficient economic growth.

(Emphasis added.)

¶94 I would find that the County's Plan and most of the challenged development regulations comply with the GMA. Accordingly, I would reverse most of the Board's holdings and direct the Board to remand to the County to allow its legislative body to make any necessary adjustments to its Plan and development regulations. I therefore concur in part and dissent in part.

ADDITIONAL FACTS AND PROCEDURAL HISTORY

¶95 In addition to the facts and procedural history cited by the majority, I note that the County passed Ordinance 2006-63 at the end of nearly a year and eight months of public participation and consideration.[17] Over 60 public hearings were held, and "[a]ll members of the public who wanted to were allowed to speak or submit written correspondence."[18] Ordinance 2007-22 was similarly adopted— only after public hearings were held and written and oral testimony taken from all concerned parties.[19] In contrast, the Board's hearings on these matters took just one day each, on July 16, 2007, and February 13, 2008, respectively.[20] Finally, I would also note that the Kittitas County Superior Court has issued a stay on each of the Board's orders in response to motions from two of the intervenors in this case.[21]

---

[17] Kittitas County Ordinance (Ord.) 2006-63 (Dec. 11, 2006), at 1-4; *see also* 1 Administrative Record (1 AR), *Kittitas County Conservation v. Kittitas County*, No. 07-1-0004c, at 300-03, 2007 WL 2729590, 2007 GMHB LEXIS 89 (E. Wash. Growth Mgmt. Hr'gs Bd. Aug. 20, 2007).

[18] 1 AR at 301-03.

[19] Ord. 2007-22 (July 19, 2007), at 1-8; *see also* 2 Administrative Record (2 AR), *Kittitas County Conservation v. Kittitas County*, No. 07-1-0015, at 8-16, 2008 WL 1766717, 2008 GMHB LEXIS 21, at *93 (E. Wash. Growth Mgmt. Hr'gs Bd. Mar. 21, 2008); *see also* RCW 36.70A.140 (requiring public participation in comprehensive plans).

[20] 1 AR at 2291; 2 AR at 1196.

[21] Kittitas County Conservation, RIDGE, and Futurewise's Mot. for Discretionary Review, App. B. A court may issue a stay only if it determines the party requesting a stay is likely to succeed on the merits.

ANALYSIS

A. Cities and Counties Have Broad Discretion To Adopt Comprehensive Plans under the GMA

¶96 The necessary starting point when reviewing any GMA case is the broad range of discretion the legislature expressly granted counties and cities to adopt comprehensive plans according to their local growth patterns, resources, and needs.[22] The legislature determined this deference is required because "[l]ocal comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances." RCW 36.70A.3201; *see also Manke Lumber Co. v. Diehl*, 91 Wn. App. 793, 804, 959 P.2d 1173 (1998) (reversing the Western Washington Growth Management Hearings Board's finding of GMA noncompliance due to lack of substantial evidence). To this end, comprehensive plans and development regulations are presumed to be valid upon adoption. RCW 36.70A.320(1). Additionally, upon challenge, the burden is on the petitioner to demonstrate that any action taken by a county or city under the GMA is not in compliance with the requirements of the GMA. RCW 36.70A.320(2). This burden is intentionally very high: hearings boards (and courts) must apply "a more deferential standard of review to actions . . . than the preponderance of the evidence standard." RCW 36.70A.3201. Neither the ma-

---

[22] RCW 36.70A.3201 states, in pertinent part:

> In recognition of the broad range of discretion that may be exercised by counties and cities consistent with the requirements of this chapter, the legislature intends for the board to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter.

Although we give weight to a hearings board's interpretation of the GMA, a hearings board's ruling is not entitled to deference from this court if it fails to give deference to a county planning decision that complies with the GMA. *King County v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000); *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 154 Wn.2d 224, 238, 110 P.3d 1132 (2005).

jority nor the Board explains how the County fails under this particularized standard of review.

¶97 Furthermore, within the constraints of this high level of deference, the hearings board *must* find that a city or county's action complies with the GMA, unless it determines that the comprehensive plan or development regulation is "clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). A county's action is not "clearly erroneous" merely because an unelected hearings board has a " 'firm and definite conviction that a mistake has been committed' ";[23] rather, " '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Ancheta v. Daly*, 77 Wn.2d 255, 259-60, 461 P.2d 531 (1969) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948));[24] *see also United States v. Or. State Med. Soc'y*, 343 U.S. 326, 72 S. Ct. 690, 96 L. Ed. 978 (1952). In short, whether an action is "clearly erroneous" should not turn on a hearings board member's "firm and definite conviction," but whether the hearings

---

[23] Majority at 154 (internal quotation marks omitted) (quoting *Lewis County v. W. Wash. Growth Mgmt. Hearings Bd.*, 157 Wn.2d 488, 497, 139 P.3d 1096 (2006)).

[24] A bit of case history is helpful here to explain how this exacting definition became lost among our precedent. The majority obtains its incomplete definition of " 'clearly erroneous' " from *Lewis County*, 157 Wn.2d at 497 (quoting *Department of Ecology v. Public Utility District No. 1 of Jefferson County*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993)). Majority at 154. *Department of Ecology*, however, cites *Cougar Mountain Associates v. King County*, 111 Wn.2d 742, 747, 765 P.2d 264 (1988). *Dep't of Ecology*, 121 Wn.2d at 201. *Cougar Mountain Associates*, in turn, cites *Polygon Corp. v. City of Seattle*, 90 Wn.2d 59, 69, 578 P.2d 1309 (1978), to explain the difference between the "arbitrary and capricious" standard and the "clearly erroneous" standard. *Cougar Mountain Assocs.*, 111 Wn.2d at 747. *Polygon Corp.* then cites *Ancheta*, where we adopted the definition of "clearly erroneous" established by the United States Supreme Court in *United States Gypsum Co. Polygon Corp.*, 90 Wn.2d at 69; *Ancheta*, 77 Wn.2d at 259-60. For the curious, an agency's decision is "arbitrary and capricious" if the decision is the result of willful and unreasoning disregard of the facts and circumstances. *Overlake Hosp. Ass'n v. Dep't of Health*, 170 Wn.2d 43, 239 P.3d 1095 (2010).

board is firmly convinced that an error of law has occurred after full consideration of the law and the evidence. Neither the majority nor the Board explains why the County's Plan and development regulations, after giving the County this high level of deference, can be found "clearly erroneous" under this exacting definition.

¶98 Finally, because the ultimate burden and responsibility for planning, harmonizing the planning goals of the GMA, and implementing a county's or city's future rests with that community, on remand we should direct the Board to remand to the County to allow its legislative body to make only the necessary adjustments to its Plan and development regulations. *See Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 125-26, 118 P.3d 322 (2005) (quoting RCW 36.70A.3201).

¶99 To summarize my conclusions below, I would hold that the presumption of the validity of the County's Plan and development regulations has not been rebutted, with the partial exception of chapter 17.31 of the Kittitas County Code (KCC). The petitioners have not shown that the County's Plan or the remaining development regulations, after application of a more deferential standard of review than the preponderance of evidence standard, remain "clearly erroneous" in view of the entire record and the goals and requirements of the GMA.

B.   The Board Improperly Dismissed Community Testimony

¶100 The Board dismissed the community testimony of Lila Hanson, Pat Deneen, and Urban Eberhart from the Kittitas County Farm Bureau to support the proposition that three-acre zoning preserves the rural character of Kittitas County and promotes agriculture. They testified that three-acre zoning would allow farmers to sell off the smallest portion of agriculturally marginal land possible for cash flow purposes in low-irrigation years, allowing the farmer to remain economically competitive by being able to

retain the greatest amount of productive farmland. This, they argued, would allow farmers to retain the most agriculturally valuable farmland possible for subsequent years when farming is better, thereby promoting agriculture and preserving rural character.

¶101 This is exactly the sort of flexibility and consideration of local circumstances the legislature intended local governments to address in their comprehensive plans. Therefore, it was improper to dismiss the evidence. Accordingly, following our analysis in *City of Arlington*, the County's action was not clearly erroneous and the Board's decision was not rendered in view of the entire record. *See City of Arlington v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 164 Wn.2d 768, 774, 193 P.3d 1077 (2008). While the majority dismisses this evidence as not dispositive of the question of rural character, *City of Arlington* is clear that when a hearings board dismisses a key piece of evidence supporting the county's action, it commits error. *Id.* at 795. The community testimony is reflective of the local circumstances of many Kittitas County farmers. Dismissing such evidence is error, which warrants reversal of the Board's decision.

C.   The County Developed a Written Record Explaining the Rural Element of the Plan

¶102 RCW 36.70A.070(5) requires counties to include a rural element in their comprehensive plan. Because circumstances vary from county to county, "a county may consider local circumstances, but shall develop a written record explaining how the rural element harmonizes the planning goals in RCW 36.70A.020[25] and meets the requirements of this chapter." RCW 36.70A.070(5)(a).

---

[25] The 13 planning goals are listed and paraphrased as follows:

   (1) Urban growth. [Encourage development in urban areas.]
   (2) Reduce sprawl. [Reduce conversion of undeveloped land into sprawling development.]
   (3) Transportation. [Encourage efficient transportation systems.]
   (4) Housing. [Encourage the availability of affordable housing.]

¶103 The GMA does not specify what form the record must take or how detailed it must be, recognizing that these are local decisions made by elected local representatives. Thus, hearings boards have recognized, as should we, that the GMA does not require a local jurisdiction to develop a separate statement explaining how its rural element harmonizes the planning goals in RCW 36.70A.020, as long as the plan itself " 'is clear in its description of how its amendments harmonize with the overall goals in Section 020.' " *Bayfield Res. Co. v. Thurston County*, No. 07-2-0017c, 2008 WL 2115328, at *12, 2008 GMHB LEXIS 37, at *32 (W. Wash. Growth Mgmt. Hr'gs Bd. Apr. 17, 2008) (quoting *Friends of Skagit County v. Skagit County*, No. 99-2-0016, 1999 WL 721857, at *5, 1999 GMHB LEXIS 351, at *14 (W. Wash. Growth Mgmt. Hr'gs Bd. Sept. 7, 1999)).

¶104 Here, chapter 8 of the Plan has the required rural element, which identifies rural lands in Kittitas County, their uses, current land use patterns, government services in rural lands, and the goals, policies, and objectives for rural land in Kittitas County. Within chapter 8, the goals of the GMA are found interspersed with the County's policies

---

(5) Economic development. [Encourage economic development.]

(6) Property rights. [Private property shall not be taken for public use without just compensation having been made.]

(7) Permits. [Applications for both state and local government permits should be processed in a timely and fair manner.]

(8) Natural resource industries. [Maintain and enhance natural resource-based industries.]

(9) Open space and recreation. [Retain open space and enhance recreational opportunities.]

(10) Environment. [Protect the environment and enhance the state's high quality of life.]

(11) Citizen participation and coordination. [Encourage citizen involvement in the planning process and ensure coordination between communities and jurisdictions to reconcile conflicts.]

(12) Public facilities and services. [Ensure the facilities and services necessary to support development are adequate to serve the development at the time the development is available for occupancy.]

(13) Historic preservation. [Identify and encourage the preservation of lands, sites, and structures that have historical or archaeological significance.]

RCW 36.70A.020.

to varying degrees.[26] Because the Board (and the majority) misapprehended what may constitute a written record, we consider the County's expression of these "goals, policies, and objectives" (GPOs) in the next few paragraphs.

¶105 With respect to urban growth and public services, GPO 8.1 states that municipal and public services "should not be extended outside of urban growth areas in Rural Lands." 1 Administrative Record (AR) at 215. GPO 8.4 states that "[e]ssential public facilities should not be located outside cities, urban growth areas or nodes . . . ." *Id.* at 216. With respect to reducing sprawl, GPO 8.3 states that "sprawl will be discouraged if public services and public facilities established under RCW 36.70A.070(5)(d) are limited to just those necessary to serve the developed area boundaries and are not allowed to expand into adjacent Rural Land." *Id.* GPO 8.13 states that "methods other than large lot zoning to reduce densities and prevent sprawl should be investigated." *Id.* at 217.

¶106 With respect to housing, GPOs 8.46-8.53 discuss where residential lots may be located and what types of developments will be considered. *Id.* at 220-21. GPO 8.46 states that "residential development on rural lands must be in areas that can support adequate private water and sewer systems." *Id.* at 220. With respect to economic development, GPOs 8.38-8.45 discuss business uses in rural lands. *Id.* As section 8.5(D) elaborates, "The economy of our rural community has traditionally been based on natural resource activities and Kittitas County encourages and supports their continuation in Rural Lands. . . . Rural Areas are not just rustic places; they are vital, thriving communities with working landscapes and working peoples." *Id.* at 219.

¶107 With respect to property rights, GPO 8.7 states that "private owners should not be expected to provide

---

[26] This makes sense, given that chapter 8 is but one section of the County's comprehensive plan. Some goals listed in RCW 36.70A.020, such as community involvement, make more sense elsewhere and need not be repeated in the rural element section.

public benefits without just compensation." *Id.* at 216. With respect to natural resource industries, section 8.2 states that the County "will strive to encourage and support [historic] resource-based activities in whatever areas and zones they occur." *Id.* at 214. With respect to historic preservation, GPO 8.11 states that "existing and traditional uses should be protected and supported while allowing as much as possible for diversity, progress, experimentation, development and choice in keeping with the retention of Rural Lands." *Id.* at 217. GPOs 8.54-8.61 discuss goals related to open space and recreation. *Id.* at 222-23.

¶108 With respect to the environment, section 8.5(G), which includes GPOs 8.62-8.66B, discusses shorelines, critical areas, habitat, and scenic areas in Kittitas County. *Id.* at 223. GPO 8.9 adds that "[p]rojects or developments which result in the significant conservation of rural lands or rural character will be encouraged." *Id.* at 217.

¶109 Viewed as a whole then, the County's Plan is clear in its description of how its amendments harmonize with the overall goals of RCW 36.70A.020. Indeed, the Plan *is* how the County explains how its rural element harmonizes the planning goals in RCW 36.70A.020. The County has developed a written record that satisfies the flexible standard of RCW 36.70A.020(5). This was supplemented by consideration of the community testimony and public input taken by the County during the year and eight months leading up to the adoption of Ordinance 2006-63. In light of this community testimony and the Plan itself, the Board's conclusion that the County failed to develop a written record is erroneous.

D. The Board Improperly Employed a Bright-Line Rule Regarding Rural Densities

¶110 The majority attempts to skirt the issue of whether the Board employed a bright-line rule to delineate between rural and urban densities, which we have held the Boards may not do. *Thurston County v. W. Wash. Growth Mgmt.*

*Hearings Bd.*, 164 Wn.2d 329, 190 P.3d 38 (2008); *Gold Star Resorts, Inc. v. Futurewise*, 167 Wn.2d 723, 734-35, 222 P.3d 791 (2009). With a wink, the majority acknowledges that "[t]he Board appears to have relied on such a rule here." Majority at 161.

¶111 The Board did improperly apply a bright-line rule in this case. The Board expressly framed the issue as "[d]oes Kittitas County's failure to review and revise the comprehensive plan to eliminate densities greater than one dwelling unit per five acres in the rural area . . . violate [the GMA]?" 1 AR at 2292; 2 AR at 1197-98; *see also Thurston County*, 164 Wn.2d at 358 n.20 (holding that although the Board did not explicitly adopt a five acre bright-line rule, such a rule was implicit in its decision because of the way the issue regarding rural densities was framed). The Board also stated:

> This Board and the other two Hearings Boards have studied rural lot sizes, effects of those lot sizes and measured these findings against the requirements of the GMA and its definitions. With this extensive research and having reviewed the Kittitas County Record, searching for the basis for the sizing of these Rural lots, this Board finds that [one dwelling per three acres] are urban densities and this urban growth is prohibited in the Rural element.

1 AR at 2302.[27] This language is equivalent to that in the Board order we struck down in *Gold Star Resorts*, in which a hearings board stated that " '[r]esidential densities of greater than one dwelling unit per five acres are not considered rural densities.' " *Gold Star Resorts*, 167 Wn.2d at 734-35 (alteration in original) (quoting Clerk's Papers at 1566 (Board's Final Decision and Order at 21)).

¶112 Here, the Board also stated that its determination "is not a 'brightline' definition" but rather "the end-result of

---

[27] This language, found in the Board's "Final Decision and Order" with respect to Ordinance 2006-63, was incorporated by reference in the Board's Final Decision and Order with respect to Ordinance 2007-22. 2 AR at 1204.

an accumulation of quantitative data which points to an appropriate lot size for rural development," considering data from outside Kittitas County. 2 AR at 1203. Thus, the Board's determination was not based on local circumstances. As to respondent's argument that the average small farm in Kittitas County is 5.62 acres, and therefore any density greater than that is urban in nature, the superior court was correct in finding that this "belies the definitions and guidelines provided to the County [by the GMA]," which were provided so that the County may "define its own rural character, rural development, and urban growth." Kittitas County Conservation, RIDGE, and Futurewise's Mot. for Discretionary Review, App. B at 7.

¶113 I would hold that a hearings board may not merely disclaim a bright-line rule while applying one. A hearings board must articulate *why* the local circumstances in a county do not support the county's own determination of what constitutes rural and what constitutes urban. *Thurston County*, 164 Wn.2d at 359 ("Whether a particular density is rural in nature is a question of fact based on the specific circumstances of each case."). Respondents have not overcome the presumption that the County's rural densities comply with the GMA given the local circumstances.

E.  The Board Improperly Found that the County Failed To Protect Rural Character

¶114 The Board found that the County's Plan and several of its development regulations fail to protect rural character under RCW 36.70A.070(5)(c). Although the majority agrees that the Plan lacks provisions required by the GMA to protect rural areas, it declined to reach the challenged development regulations (perhaps because they are not clearly erroneous). I would reverse rather than affirm the Board on this issue because the County's Plan complies with RCW 36.70A.070(5)(c), and because the County is entitled to deference with respect to implementing measures it decides will best protect rural character.

¶115 I reach this conclusion because the majority conflates the separate but related functions of a plan and development regulations. A comprehensive plan is "a generalized coordinated land use *policy statement* of the governing body of a county or city that is adopted pursuant to this chapter." RCW 36.70A.030(4) (emphasis added). It is not a set of regulations and standards. *Cf.* majority at 162-63. Development regulations, on the other hand, are "the *controls* placed on development or land use activities by a county or city," and are what actually implement the plan. RCW 36.70A.030(7) (emphasis added), .040. In other words, a plan is like a blueprint for a home. It guides construction but does not imbue the home with substance. Development regulations, on the other hand, are like brick and mortar. They serve both to build the home (growth) and to protect its interior (management). While a house must be built according to the specifications in the blueprint, as with a plan, the specifications need only detail the kind of home the county wants to build for itself. The county bears the ultimate burden and responsibility for planning and implementing the sort of home its citizens want. *See* RCW 36.70A.3201. The GMA was enacted to allow citizens, local governments, and interested entities to coordinate and cooperate with each other with respect to land use planning, not to mandate a particular outcome chosen by unelected boards.

¶116 The majority finds this analogy too simplistic. Majority at 164 n.6. However, this has been our understanding of the role of comprehensive plans for decades. *E.g., Woods v. Kittitas County,* 162 Wn.2d 597, 613, 174 P.3d 25 (2007) (comprehensive plans serve as " 'guide[s]' " or " 'blueprint[s]' " (alterations in original) (internal quotation marks omitted) (quoting *Citizens for Mount Vernon v. City of Mount Vernon,* 133 Wn.2d 861, 873, 947 P.2d 1208 (1997))); *see also Barrie v. Kitsap County,* 93 Wn.2d 843, 849, 613 P.2d 1148 (1980) (comprehensive plans are " 'guide[s]' to adoption of zoning regulations" and " 'blue-

print[s] which suggest[ ] various regulatory measures' "
(quoting *Lutz v. City of Longview*, 83 Wn.2d 566, 574, 520
P.2d 1374 (1974) and citing *Buell v. City of Bremerton*, 80
Wn.2d 518, 526, 495 P.2d 1358 (1972))); *see also Shelton v.
City of Bellevue*, 73 Wn.2d 28, 35, 435 P.2d 949 (1968). In
*Shelton*, we described comprehensive plans in the following
manner:

> "[P]lanning," in the broad sense, contemplates the evolvement
> of an over-all program or design of the present and future
> physical development of the total area and services of the
> existing or contemplated municipality. . . . By its very nature
> and purpose, realistic municipal "planning" is and must be
> comprehensive, flexible, and prospective . . . . [*S*]*ince it usually*
> *proposes rather than disposes, it does not ordinarily, without*
> *further regulatory implementation, in and by itself, impose any*
> *immediate restrictions upon the land area it purports to cover.*
> *Planning, as such, then in effect forms a blueprint for the*
> *various regulatory measures it suggests.*

*Shelton*, 73 Wn.2d at 35 (emphasis added). The majority
argues that the legislature has "required that certain
elements be included in the blueprint (or the Plan) itself,
including protection of rural character." Majority at 164 n.6.
The majority misapprehends the nature of these required
elements, rendering development regulations redundant
and plans even more unwieldy.

¶117 By requiring "measures," RCW 36.70A.070(5)(c)
contemplates that the Plan shall include *policy statements*
relating to the five criteria of RCW 36.70A.070(5)(c), which
apply to and protect rural character when implemented by
development regulations.[28] As explicated above, chapter 8
of the County's Plan contains these required policy state-
ments. 1 AR at 215-23.

---

[28] The five criteria are:

(i) Containing or otherwise controlling rural development;

(ii) Assuring visual compatibility of rural development with the surrounding
rural area;

(iii) Reducing the inappropriate conversion of undeveloped land into sprawl-
ing, low-density development in the rural area;

¶118  In sum, the work of actually implementing a comprehensive plan falls to a county's development regulations adopted by duly elected local officials. Indeed, this is why the County's Plan states:

> The Comprehensive Plan is based on a framework of community goals and objectives adopted by the County as a formal expression of public policy. There is no assurance, however, that orderly development or any of the other goals will be accomplished simply by the formal adoption of the Plan. The value of the Plan lies in the determination and commitment of the County in the future to implement the Plan through the adoption of ordinances and codes designed to achieve the stated objectives.

*Id.* at 56. This statement is not an indictment against the County as the majority suggests. Majority at 163.

F.  The Board Improperly Concluded that the County Failed To Provide for a Variety of Rural Densities

¶119  I also disagree with the majority's conclusion that the County did not provide for a variety or rural densities in its Plan. Here, the Plan specifically states that "Kittitas County recognizes and agrees with the need for continued diversity in densities and uses on Rural Lands." 1 AR at 216 (GPO 8.5). This provision for a variety of rural densities is included in the Plan's rural element and therefore satisfies RCW 36.70A.070(5)(b). That the Plan's provision for rural densities is borne out by the County's zoning regulations, which allow for six different rural densities, is not problematic. It is statutorily intended. Unlike the situation that could produce the loophole Kittitas County Conservation; RIDGE; Futurewise; and the Washington Department of Community, Trade, and Development suggest, the County's

---

(iv) Protecting critical areas, as provided in RCW 36.70A.060, and surface water and groundwater resources; and

(v) Protecting against conflicts with the use of agricultural, forest, and mineral resource lands designated under RCW 36.70A.170.

RCW 36.70A.070(5)(c).

Plan is not silent on the provision of rural densities. Therefore, it cannot be circumvented by site-specific rezones. This argument is without merit.

G.  Chapter 17.31 KCC Does Not Fully Comply with the GMA

¶120  RCW 36.70A.170(1)(a) requires cities and counties to designate and preserve agricultural land of long-term commercial significance. RCW 36.70A.177 allows cities and counties to use innovative zoning techniques to achieve this end, including agricultural zoning that limits the density of development and restricts or prohibits nonfarm uses of agricultural land. Agricultural zoning may allow agricultural and nonagricultural accessory uses[29] that support, promote, or sustain agricultural operations and production. RCW 36.70A.177(2)(a).

¶121  Chapter 17.31 KCC provides for conditional uses for farm laborer shelters, room and board lodging, canneries and processing plants for agricultural products, livestock sales yards, and churches, in addition to the uses mentioned by the majority. All these uses directly promote and sustain agricultural operations and production.

¶122  Thus, rather than affirm the Board's order that chapter 17.31 KCC is noncompliant with the GMA, I would direct the Board to remand to the County to amend those provisions that are not designed to conserve agricultural lands and encourage the agricultural economy as required by RCW 36.70A.177(1).

¶123  The Board also incorrectly concluded that chapter 17.31 KCC is "void as to the scope and limitations of [conditional] uses, thus allowing unlimited discretion in permitting them." 2 AR at 1217. The County's ordinances must be read as a whole: KCC 17.60A.010 and KCC 17.60A.020, for example, contain various restrictions on whether conditional permits are granted in general. How-

---

[29] "Accessory uses" are defined in RCW 36.70A.177(3).

ever, because these ordinances are not specific to the goals of conserving agricultural lands or the agricultural economy, I would allow the County on remand to strengthen its development regulations to include criteria constraining when conditional permits may be granted on agricultural land in particular.

## H. The Board Unlawfully Found that the County's Subdivision Regulations Fail To Protect Water Resources

¶124 Finally, I cannot agree with the Board's decision that chapter 16.04 KCC violates the GMA by not explicitly requiring that "all land within a common ownership or scheme of development be included within one application for a division of land." 2 AR at 1218, 1221-23. Chapter 16.04 KCC speaks only to the procedure for submitting preliminary plat applications, not to whether an application is ultimately approved. Other agencies make the decisions on water use. The County's ordinances and Plan must be read as a whole, and several of the County's ordinances address groundwater. Majority at 179 n.10. Without explaining how Kittitas County's Plan and development regulations fail to protect water resources *as a whole*, respondents cannot meet their burden to rebut the presumption that the County's ordinances are valid.

### Conclusion

¶125 The amended GMA and our case law require growth hearings boards to give cities and counties a high level of deference. Here, the Board failed to give the County the requisite level of deference, leading the Board to conclude incorrectly that the County's Plan and several of its development regulations are "clearly erroneous." The respondents have not rebutted the presumption that the County's Plan and development regulations are valid (with one partial exception of chapter 17.31 KCC).

¶126 Because the County's Plan and most of its development regulations comply with the GMA, I would reverse the

Board and remand, with instructions to remand to the County. This would allow the County's elected legislative body to make necessary adjustments to its Plan and development regulations, rather than permit an unelected Board to dictate planning requirements. The majority's decision to remand to the Board will serve only to further protract and delay sustainable growth and planning while not allowing the County and its citizens to govern themselves as the GMA intended. I therefore respectfully concur in part and dissent in part.

SANDERS, J. PRO TEM., concurs with J.M. JOHNSON, J.