IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CITY OF AIRWAY HEIGHTS, | ) | No. 33083-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| EASTERN WASHINGTON GROWTH | ) | |
| MANAGEMENT HEARINGS BOARD, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| SPOKANE COUNTY, CITY OF | ) | PUBLISHED OPINION |
| SPOKANE, SPOKANE AIRPORT | ) | |
| BOARD, | ) | |
| | ) | |
| Appellants, | ) | |
| | ) | |
| BRIGITTA ARCHER, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| BRIGITTA ARCHER, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |

No. 33083-4-III
*City of Airway Heights v. E. Wash. Growth Mgmt. Hr'gs Bd.*

EASTERN WASHINGTON GROWTH ) 
MANAGEMENT HEARINGS BOARD, ) 
         ) 
           Defendant. ) 
         ) 
SPOKANE COUNTY, CITY OF ) 
SPOKANE, SPOKANE AIRPORT ) 
BOARD, and CITY OF AIRWAY ) 
HEIGHTS, ) 
         ) 
           Appellants. ) 

LAWRENCE-BERREY, A.C.J. — Incompatible residential and commercial development around a military installation can jeopardize the installation's mission and, in turn, jeopardize the economies of nearby communities. Washington State's Growth Management Act (GMA), chapter 36.70A RCW, addresses this problem by prohibiting "development in the vicinity of a military installation that is incompatible with the installation's ability to carry out its mission requirements." RCW 36.70A.530(3).

Here, the city of Airway Heights (City) adopted Ordinances Nos. C-797 and C-798 to provide a conditional use process for multi-family residential development in the vicinity of Fairchild Air Force Base (FAFB) and the Spokane International Airport (SIA). The Eastern Washington Growth Management Hearing Board (GMHB or the Board) invalidated the ordinances under RCW 36.70A.530(3), as well as other provisions of the GMA. The Spokane County Superior Court reversed the GMHB.

2

We hold that the GMHB did not err in balancing the deference owed to the City's ordinances against the evidentiary weight it gave to the opinions of persons and agencies with expertise and with the nonbinding recommendations made in the Fairchild Air Force Base Joint Land Use Study (JLUS). We affirm the conclusion of the GMHB that the ordinances violate the GMA by allowing development that is incompatible with FAFB's ability to carry out its current or future missions in violation of RCW 36.70A.530. However, we reverse the conclusions of the GMHB that the ordinances (1) fail to discourage siting or expansion of incompatible uses adjacent to the SIA in violation of RCW 36.70.547, and (2) preclude the siting or expansion of FAFB or the SIA in violation of RCW 36.70A.200. Because we affirm one of the three bases on which the GMHB invalidated the challenged ordinances, we affirm the result of GMHB's decision and order invalidating the City's ordinances.

## FACTS

### 1. *The Challenged Ordinances*

On August 5, 2013, in response to a housing deficiency, the City Council of Airway Heights adopted Ordinance Numbers C-797 and C-798 (the ordinances). These ordinances amended the City's zoning regulations and maps, redesignated approximately 29 acres of commercial property in the vicinity of FAFB and the SIA as multi-family

3

residential, and authorized the City's hearing examiner to conditionally approve multi-family residential development. The conditional approval was subject to (1) an evaluation to demonstrate a community need for residential use, (2) a noise study demonstrating that 69 day-night average sound level (Ldn) was not exceeded over a prescribed period of time, (3) outdoor noise abatement of at least 25 decibels (dB) with additional consideration for peak noise or vibrations, (4) density not to exceed 10 to 20 units per acre, (5) residential units to be located furthest from the operational flight path, (6) the owner to sign an aviation easement waiving liability for noise, and (7) development conditions, including consideration of comments from FAFB.

2. *Background Prior to the Ordinances*

The Deer Creek Apartment development lies within the boundaries of the property involved in this case. The Deer Creek project originally contemplated 280 residential units built in two phases. *Deer Creek Developers, LLC v. Spokane County*, 157 Wn. App. 1, 5, 236 P.3d 906 (2010). Phase I of Deer Creek was permitted due to an error in the County's zoning code that was corrected before the developer applied for Phase II.

In 2008, Deer Creek submitted an application to develop Phase II. Phase II involved 124 multi-family units on about 5 acres. The hearing examiner received opposition to Deer Creek's application from several agencies. The United States

4

No. 33083-4-III
*City of Airway Heights v. E. Wash. Growth Mgmt. Hr'gs Bd.*

Department of the Air Force at FAFB opposed construction of the additional apartments

based on potential changes in noise contour lines:

> Based on the 1995 Fairchild AFB Air Installation Compatible Use Zone
> (AICUZ) Study, the subject property is located in the 65-70 Ldn Noise
> Zone. Based on Fairchild's 2007 AICUZ study, the property is now outside
> the 65 Ldn line. This demonstrates that noise zones expand and contract as
> the mission changes at Fairchild AFB. Unfortunately, we cannot predict
> Fairchild's future noise zones; however, we do know that the subject
> property will be susceptible to aircraft noise for the foreseeable future.

Admin. Record (AR) at 370.

The SIA's concerns went beyond noise abatement, objecting that the project would

adversely impact the layout and length of its proposed third runway:

> The project currently under consideration is an expansion of a
> nonconforming use which is located within the airport area of influence and
> would serve to further jeopardize current and future airport operations. . . .
> further jeopardize because the existing 120 units have already been allowed
> to be built and will impact on the proposed runway layout, length, and
> orientation).

> [The development] is within 2500 feet of the end of the proposed runway.
> The implications for potential challenges and long-term effects are obvious.
> Therefore, the Spokane Airport Board respectfully requests that the hearing
> examiner consider the impact to the airport and not allow the expansion or
> continuation of this or any other nonconforming use in the airport influence
> area.

AR at 372.

The Federal Aviation Agency (FAA) considered the proposed apartment complex an incompatible land use because it was "located within the 'area of influence' of two major airports, and located in a potential cumulative noise impact area." AR at 372. It explained that the proposed development could be exposed to significant numbers of aircraft flying at low altitudes, which would subject the area to significant noise impacts. The FAA also expressed concern regarding the proportionately higher percentage of accidents that occur in aircraft traffic pattern areas, considering the volume of aircraft that use the concentrated areas of airport approach areas, together with the complexities of takeoff and landings. It also noted that residents in such areas often experience safety concerns from visual observations of low-flying aircraft operating into and out of the airport. It stated, "it would be disconcerting to many people on the ground in this area . . . due to a perceived hazard of low-flying aircraft." AR at 374. The FAA emphasized that such visual perceptions, and related complaints, are one of the main reasons that large-scale residential developments are strongly discouraged in airport areas of influence.

The FAA emphasized that safety is its first priority, but that another significant priority is protecting the public investment in airports through compatible land use, planning and zoning. The FAA noted that it had long supported the airport as an important aviation facility and that it had funded much of the development of the airport

6

over the years, at a cost exceeding $94 million. It stated it depends on local authorities to protect the airport from encroachment by incompatible land uses.

The FAA observed that current aircraft operations for the airport and FAFB have been acceptable over the largely vacant land in the area, but that this was being jeopardized by the high density residential development approved south of the site, as well as the proposed multi-family project. It advised that it requires airport owners and the city of Spokane and Spokane County to ensure compatibility between the airport and surrounding land uses. It summarized its concerns: "Permitting high density residential uses weakens existing protection for the airport, the flying public, and the future residents by allowing incompatible development and potential hazards closer to the critical phases of aircraft approach and departure operations." AR at 374.

Greater Spokane, Incorporated, which combines both the Spokane Chamber of Commerce and the Spokane Economic Development Council, also opposed the development. It noted that the SIA and FAFB are critical assets for the economic growth of our region, that FAFB is the largest employer in the region and has an economic impact in the community approaching $1 billion. It maintained that the SIA may be the single most important asset for continued economic growth in the region. It continued:

7

> We have seen too many examples of where the Air Force has curtailed flying operations at other bases simply due to volume of noise complaints from the community. For that reason, encroachment of residential development around flying operations is viewed by base closure and realignment commissions as a principal factor when considering closure of a facility.

> We believe that allowing this incompatible use to proceed will create a precedent that will significantly complicate future actions to prevent encroachment. Fairchild Air Force Base and Spokane International Airport are simply too important to allow them to be "boxed in."

AR at 376.

A hearing examiner denied the application for the residential apartment project, concluding that the development, even as conditioned with sound attenuation, "would weaken existing protection for the airport and Fairchild AFB, the flying public and future residents, by allowing incompatible development and potential hazards closer to the critical phases of aircraft approach and departure operations; and would jeopardize the future viability of such facilities." AR at 332.

Deer Creek appealed the hearing examiner's denial of the conditional use permit. The superior court affirmed the decision of the hearing examiner. *Deer Creek*, 157 Wn. App. at 6. This court affirmed the superior court, stating:

> The unchallenged facts establish that the Deer Creek site will be subject to airport noise for the foreseeable future and that the noise impact zones for FAFB expand and contract as the mission of FAFB changes. Findings of fact also establish that a multifamily development on the Deer

8

Creek site would adversely impact the layout, length, and orientation of a proposed runway for SIA and will jeopardize current and future SIA operations.

*Id.* at 17.

### 3. *The 2009 Fairchild Air Force Base Joint Land Use Study (JLUS)*

While the Deer Creek case was making its way through the courts, entities including Airway Heights, FAFB, the SIA, and the City and County of Spokane participated in the JLUS. The study was a voluntary collaborative planning effort involving "local communities, federal officials, residents, business owners, and the military to identify compatible land uses and growth management guidelines near active military installations." AR at 378. Its purpose was to provide a mechanism for FAFB and local governments to work as a team to prevent incompatible land uses. Its goals included: (1) managing development in the vicinity of FAFB that would interfere with the continued operations of FAFB, (2) maintaining the economic vitality of the community, (3) ensuring the ability of FAFB to achieve its mission, and (4) preserving the ability of FAFB to expand or adapt its missions to changing conditions. It stated: "[t]he goal of the Fairchild JLUS is to protect the viability of the current and future missions at Fairchild AFB while at the same time accommodating growth, sustaining the economic health of the region, and protecting the public health and safety." AR at 417.

The JLUS stated that urban development in the vicinity of military installations can negatively impact military activities and readiness and that "[t]his threat to military readiness activities is currently one of the military's greatest concerns." AR at 416. It emphasized that its purpose was to be a planning guide, not a regulatory document:

> This section provides a general technical background on the factors discussed based on available information. The intent is to provide an adequate context for awareness, education, and development of JLUS recommendations. As such, it is not designed or intended to be utilized as an exhaustive technical evaluation of existing or future conditions within the study area.

AR at 462.

The JLUS identified the Deer Creek development as particularly concerning, designating high density residential housing a critical threat to FAFB's mission, stating "[d]evelopment within Fairchild's critical operations area will limit the ability of the installation to adapt to new missions, to support new/different aircraft, and could jeopardize its long-term viability." AR at 474. The JLUS noted that even though the Deer Creek development was currently outside the 65 Ldn noise contour, safety, noise, and light pollution remained concerns.

Emphasizing that aircraft noise is a primary concern in compatibility planning, the JLUS devoted a substantial portion of its evaluation to the noise

10

impacts of military airfields. It utilized a technical noise study to assess current and future conditions, evaluated four future mission scenarios, and assumed a third SIA runway oriented parallel to the FAFB runway. The results of these scenarios were combined with 20-year forecast modeling results for the SIA to provide an overall perspective on the effect of all aircraft operations within the region.

The study also relied on the 2007 Fairchild Air Installation Compatible Use Zone (AICUZ) study, which is a Department of Defense (DOD) planning program that was developed in response to incompatible urban development and land use conflicts around military airfields. The AICUZ provided detailed noise modeling of current aircraft operations at the installation. However, the JLUS cautioned against undue reliance on the AICUZ noise contours because AICUZ contours are based only on current conditions and do not account for changes in installation operations.

The JLUS also established four categories of military influence areas (MIA), which it defined as "designated geographic planning area[s] where military operations may impact local communities, and conversely, where local activities may affect the military's ability to carry out its mission." AR at 592. The four MIAs were designated in part to establish compatibility requirements within the

11

designated MIAs. MIAs 3 and 4 are at issue in this case. MIA 3 is described as an "area that is defined by a ¼ mile area around the 65 Ldn contour for the potential mission scenario, which is based on a mix of next generation air refueling aircraft and B-52 aircraft." AR at 601. Strategies applied to MIA 3 focus on noise attenuation. MIA 4 designates an area of greater concern. MIA 4 is defined as "having a potential for noise and safety impacts to which land use controls are appropriate." AR at 595. The JLUS provided that within MIA 4, "[l]and currently designated for non-residential use shall not be redesignated to a residential use category." AR at 641. A JLUS map shows that the property is within MIA 4. Prior to Airway Heights' annexation of the property and adoption of the ordinances, the property was designated for commercial uses. Therefore, under the JLUS, the property was prohibited from being redesignated to a residential category.

4. *Annexation of the Property and Interlocal Agreement*

After the hearing examiner denied Deer Creek's conditional use permit, the City moved forward to annex the property. These efforts prompted negotiations between Airway Heights, Spokane County, and the city of Spokane. During this process, the parties entered into an interlocal annexation agreement to ensure protection of FAFB and

the SIA. In the December 3, 2009 annexation agreement, the parties agreed that the SIA

and FAFB are essential public facilities and that the JLUS provided a sound tool for

determining whether development was compatible with FAFB and the SIA. The

agreement provided that the parties should discourage development that is incompatible

with FAFB's operational needs and ability to carry out future missions.

The agreement defined "incompatible development" as *"permitted land uses that*

*are inconsistent with the Fairchild Air Force Base Joint Land Use Study ("JLUS"),*

[Washington State Department of Transportation (WSDOT)] Aviation Division

Regulations, FAA Regulations, state statutes or regulations." AR at 352 (emphasis

added). The City's annexation of the property occurred on January 1, 2012.

The city of Spokane, Spokane County, Airway Heights, Medical Lake and FAFB

subsequently formed a partnership to draft policies and regulations to implement the

strategies recommended in the JLUS. The parties formed a coordinating committee and

established a technical assistance group. These groups were responsible for reviewing

draft comprehensive plan amendments and development and code regulations to ensure

compliance with the JLUS. With this interim process in place, the coordinating

committee proceeded to evaluate the means through which jurisdictions could implement

the JLUS recommendations.

After annexation of the property, Airway Heights began considering amendments to its mixed use regulations to allow development of Phase II of the Deer Creek apartments as well as high density multi-family residential housing on all of the property. During December 2011, due to concerns that the proposed regulations would threaten FAFB operations and conflict with the regulations being developed to implement the JLUS, Airway Heights implemented a moratorium on applications for conditionally approved residential units on commercially zoned properties.

In March 2012, the City's planning commission began considering a conditional use permit process to allow for residential development in certain commercial zones. Derrick Braaten, the City's planner, explained that Airway Heights Municipal Code (AHMC) 17.37 needed to be updated due to it being too broad and lacking in design standards such as sound attenuation. He stated there was a severe deficiency in multi-family housing in the area and that the amendments allowed for expansion of potential housing options, particularly multi-family developments. He stated that any proposed multi-family developments in commercial areas would be highly regulated and would require sound attenuation in the 65-69 Ldn sound contours.

In response, the city of Spokane advised Mr. Braaten that it opposed Airway Heights' unilateral proposal to allow new residential development within MIA 4, stating

14

such development would impair FAFB's ability to carry out its mission requirements and would jeopardize FAFB's competitiveness in future base closure rounds. It noted that the JLUS and state and federal laws discourage locating new residential development of any kind in areas of high noise impact. It warned that "[a]llowing new residential uses, even as part of a mixed use development, in the 65 Ldn noise contour for Fairchild and MIA 4, as identified by JLUS, is not appropriate and will give false expectations if the mixed-use overlay zone covers areas within the 65 Ldn noise contour." AR at 691.

Spokane County also objected to the proposed amendments. The county commissioners found the amendments in violation of the JLUS, which had recommended against expanding residential uses in the MIA 4, and the implementation policies developed by the JLUS steering committee at its March 8, 2012 meeting. In a letter to Mr. Braaten, they stated: "The draft policies and regulations recognized by the JLUS Implementation Steering Committee combined MIA 3 and MIA 4 into MIA 3/4 in the draft Fairchild Air Force Base Overlay Zone .... As a part of the regional collaborative process Mayor Patrick Rushing and you were in attendance at the meeting at the point that specific recommendation was both debated and agreed upon in what is now referred to as the Draft Document." AR at 698. In response to Mr. Braaten's argument that the AICUZ standards provide adequate protections, the commissioners argued that the

15

standards provide only minimal protections for FAFB's national security mission:

> The adoption of substantive protections in JLUS Overlay Zoning
> Regulations by all relevant jurisdictions is of equal or perhaps greater
> importance in securing the siting for the KC 135 replacement tanker and
> averting a closure during the upcoming 2013 and 2015 BRAC [Base
> Realignment and Closure Commission] processes. Clearly, allowing for
> more intense and specifically residential development within 65 Ldn
> contour and underneath identified training flight patterns for FAFB is
> inconsistent with the region's commitment to protecting FAFB from
> closure.

AR at 699.

### 5. *County and Municipality Implementation of the JLUS*

Meanwhile, Spokane County initiated an amendment to its zoning code to implement the JLUS in the county. At the public hearing, Airway Heights opposed a proposal to combine MIA 3 and 4, arguing that both the DOD AICUZ and the JLUS only required noise abatement in the MIA 3, not the broader restrictions associated with MIA 4. Mr. Braaten disagreed with the land use restrictions in the 65 Ldn contours, pointing out that the DOD AICUZ and the JLUS state that prohibitive land use restrictions should not occur until the 70 Ldn. He argued that residential development within the 65 Ldn could be compatible with appropriate sound mitigation. He argued that extending MIA 4 to MIA 3 is arbitrary and unfairly burdens landowners with unnecessary restrictions that offer little benefit to FAFB because the area is outside of any actual encroachment area.

16

Spokane County's resolution ultimately prohibited new residential zones in the MIA 3/4, providing: "Urban residential uses are acceptable in MIA 3/4 provided that the underlying zone adopted prior to adoption date of this chapter is a residential zone." AR at 794.

In a substantially similar regulation, the city of Spokane added a chapter to its municipal code to implement the JLUS. Its ordinance stated: "It is the purpose of this chapter to prevent incompatible land uses in the vicinity of Fairchild Air Force Base (Fairchild AFB) consistent with the recommendations of the Fairchild AFB 2009 Joint Land Use Study, Air Installation Compatible Use Zone Study (AICUZ)." AR at 726. The ordinance recognized that FAFB's missions "may be modified in the future to include more substantial aircraft operations involving more intrusive aircraft" and stated that the regulations were implemented to protect FAFB's expansion of its military missions by restricting incompatible land uses. AR at 726.

Like Spokane County's ordinance, the city of Spokane's ordinance combined MIAs 3 and 4, stating "MIA 3/4 is the primary land use impact area whereby land uses and development densities have the potential to adversely impact Fairchild AFB." AR at 730. It defined incompatible land use as "[u]ses that put people in harm's way, increase the risk or severity of an aircraft accident, endanger public infrastructure, or reduce the

17

long-term functionality and economic viability of the region's civil and military aviation facilities." AR at 730. It prohibited new residential zones in the MIA 3/4.[1]

Due to the disagreement between the local governments regarding implementation of the JLUS, Airway Heights, the city of Spokane, and Spokane County entered into a "MEMORANDUM OF UNDERSTANDING [MOU] REGARDING IMPLEMENTATION OF THE JOINT LAND USE STUDY FOR FAIRCHILD AIR FORCE BASE (JLUS)." AR at 1121. The MOU, effective August 2, 2012, noted that the parties had previously agreed to a definition of incompatible as "permitted land uses that are inconsistent with JLUS, WSDOT Aviation Division Regulations, FAA Regulations, state statutes or regulations." AR at 1121. It provided for a period of 90 days for the parties to reach an agreement regarding future residential development in Airway Heights.

Five months later, with the approval of the JLUS coordinating committee and the Spokane County commissioners, Airway Heights adopted JLUS Ordinance C-771, "JLUS Protections for FAFB." AR at 1142. Land use under this ordinance is governed by standards set forth in the 1995 AICUZ. Similar to the JLUS, it discouraged residential

---

[1] This background is provided only to show the context of the dispute. Because the property is subject to the more stringent MIA 4 limitations, the fact that the city of Spokane and Spokane County determined that MIA 3 should be subject to the more

development in the 65-69 Ldn and generally prohibited it in areas exceeding 70 Ldn. The ordinance generally prohibited new or expanded residential development in MIA 3/4, but permitted proposed multi-family or mixed use development through a conditional use permit, subject to the provisions of the underlying zone. *Significantly, nothing in the MOU altered that portion of the JLUS that prohibited the City from redesignating the commercial property involved in this case to a residential category.*

In July 2013, the City passed a resolution regarding proposed modifications to its land use regulations. The resolution noted that the JLUS MOU group had reached consensus concerning "the proposed JLUS Ordinance of the City (AHMC Chapter 17.16) which adopts the 2009 JLUS Study, the amended MIA 3/4 designation and the Spokane County Regulations set forth in County Resolution 12-344 to the extent they are not inconsistent with the City JLUS Ordinance." AR at 1640. The resolution noted that Airway Heights' JLUS ordinance, C-771, incorporated DOD instructions regarding land uses that are compatible with FAFB operations and allowed conditional mixed use developments with multi-family dwellings in C-2 (commercial zones). The City moved forward with its proposed amendments to AHMC 17.11 and 17.37. It received significant opposition to the proposed changes, particularly regarding the potential residential

---

stringent limitations of MIA 4 is of no consequence to our decision.

19

development of the property at issue here.

In May 2013, the SIA advised the City that it was in the process of completing an update to the airport master plan and that the location of a future parallel runway was only an approximation. It stated that the C-2 area located in the vicinity of Deer Heights Road may present an incompatible land use related to the future parallel runway. It stated: "Adopting zoning that permits residential use within close proximity to the Airport may ultimately create situations requiring preventive or remedial mitigation actions to ensure that the ability of the Airport to develop and operate without limitations is not hindered." AR at 667.

The SIA noted that its board adopted the findings and recommendations of the JLUS on March 21, 2012. It emphasized that "[a] key component of the staff recommendation and Board approval of the JLUS relates to the measure calling for no new residential development within 65 [Ldn] contour or higher." AR at 667. It therefore opposed Airway Heights' proposals as inconsistent with the JLUS.

The SIA recognized the ordinances provided for noise attenuation to achieve compatibility in the 65 Ldn to 70 Ldn contour, but emphasized that sound attenuation is typically installed as a remedial mitigation to achieve some improved livability for persons located in established residential dwellings and is not generally recognized as an

20

enabling mechanism to allow for encroachment of incompatible use in areas of 65 Ldn and higher noise exposure. It stated, "[s]ound insulation will not resolve complaints about other overflight impacts such as landing lights, vibration, dust, fumes and interference with electronic devices, etc. and will obviously not permit the enjoyment of outdoor activities in these areas by the residents." AR at 667. It warned that implementation of the proposed land use changes would set a precedent to allow incompatible uses in commercial zones and could negatively impact the SIA in the future.

FAFB also voiced its opposition. In a letter to Mr. Braaten, Colonel Brian Newberry emphasized that it is difficult to predict future noise contours. He compared noise zones in the 1995 AICUZ with those in the 2007 study, pointing out that the highlighted parcel on the map in the 1995 FAFB AICUZ is located in the 65-70 Ldn noise zone, but that the 2007 study located the parcel outside the 65 Ldn contour line. Despite the unpredictability of future noise contours, the colonel was certain that the parcel "will be susceptible to aircraft noise into the foreseeable future, from both FAFB and Spokane International Airport." AR at 652. Referencing the 2009 JLUS, he pointed out that the subject property is within MIA 3/4 and that FAFB was concerned about increasing residential density in an area so close to where military jet aircraft fly instrument approaches to the runway. He noted:

21

> Noise will be a factor as both airports operate 24 hours a day. While sound mitigation techniques can be used during construction, we strongly do not recommend increasing residential development in that area. Safety is also a factor worth considering and the close proximity to the approaches of the two runways would increase the risk to the residents in the event of a catastrophic aircraft accident.

AR at 653.

The aviation division of the WSDOT also opposed the amendments, noting that the Deer Creek site was close to the SIA's planned parallel runway. In a letter to Mr. Braaten, it summarized its concerns, noting that "[r]esidential development on the Deer Creek site will be impacted from a variety of aviation activities. Such activities may include, but are not limited to, noise, light, vibration, odors, hours of operation, low overhead flights and other associated activities." AR at 657.

Spokane's planning and development department also opposed the proposed ordinances, stating "[t]he proposal appears to be an effort to pave the way for additional high density residential housing in an area that will be subject to impacts from both Fairchild Air Force Base and Spokane International Airport for the foreseeable future, will jeopardize current and future missions/operations of both facilities, and will be detrimental to the public health, safety, or general welfare." AR at 674. The department cautioned: "Allowing new residential uses even as part of a mixed use development, in the LdN 65 noise contour for Fairchild Air Force Base (FAFB) and the Military Influence

22

Area (MIA) 4, identified by the 2009 Joint Land Use Study (JLUS), is not appropriate and will give false expectations if the mixed-use overlay zone covers areas within the LdN 65 noise contour." AR at 680.

Despite this opposition, the City adopted Ordinances C-797 and C-798, which, as detailed above, incorporate Airway Heights' JLUS (Ordinance C-771) and potentially allow the development of multi-family housing on the subject properties pursuant to a conditional use process. Ultimately, the City dismissed the concerns of Fairchild's base commander, aviation experts, and the City and County of Spokane, stating that their concerns appeared to be based on their JLUS standards, not the Airway Heights' JLUS.

Spokane County, the city of Spokane, and the SIA Board petitioned for review to the GMHB.

### 6. *GMHB Decision*

In a 37-page ruling, the GMHB invalidated the challenged ordinances as not complying with the GMA. In its decision, the GMHB gave "significant weight" to comments from FAFB, the SIA, and the FAA. Clerk's Papers (CP) at 82. The Board explained that these agencies had "specialized knowledge and expertise relating to the residential land use/military operations compatibility issues." CP at 82. In addition, the Board gave weight to the 2008 findings of the hearing examiner, as upheld by this court

23

in *Deer Creek*. The Board explained its reason for giving weight to the 2008 findings was because "the 2008 denial pertained to a portion of the subject Property." CP at 82. In addition, the GMHB gave weight to the JLUS, because "Airway Heights [had] agreed . . . that 'incompatible development' mean[t] permitted land uses that are inconsistent with the JLUS." CP at 82.

The Board entered the following findings of fact:

1. Ordinance Nos. C-797 and C-798 modified the land use designations and development regulations affecting approximately 29-30 acres of land within the City of Airway Heights. . . .

2. The Airway Heights C-2 zone is a land use classification that allows for general commercial uses, as a conditional use, including *inter alia* Multi-Family Residential as part of an approved mixed-use development plan . . . .

3. The Multi-Family Residential development authorized by Ordinance Nos. C-797 and C-798 allows an increase in the number and density of residential uses in the vicinity of Fairchild Air Force Base and near Spokane International Airport.

4. An increase in the number and density of residential uses in the vicinity of Fairchild Air Force Base and near Spokane International Airport has a high potential for adverse noise and safety impacts.

5. High density residential development would be incompatible with aircraft approach and departure operations and would jeopardize the future viability of Fairchild Air Force Base and Spokane International Airport.

6. The property affected by Ordinance Nos. C-797 and C-798 is located within Fairchild Air Force Base's critical operations area designated Military Influence Area 4.

7. The Multi-Family Residential development authorized by Ordinance Nos. C-797 and C-798 will affect current Air Force operations and will limit the ability of Fairchild Air Force Base to adapt to new missions, support new/different aircraft, and could jeopardize the Base's long-term viability.

8. The Multi-Family Residential development authorized by Ordinance Nos. C-797 and C-798 will limit the ability of Spokane International Airport to construct and operate a future parallel runway.

9. The Multi-Family Residential development authorized by Ordinance Nos. C-797 and C-798 is incompatible with current and future operations of Fairchild Air Force Base and Spokane International Airport.

10. Fairchild Air Force Base and Spokane International Airport are Essential Public Facilities.

CP at 94-95. Based on these findings, the Board was left with a firm and definite conviction that a mistake had been made, and that the challenged ordinances were clearly erroneous in light of the goals and requirements of the GMA in that the challenged ordinances improperly (1) authorized development in the vicinity of FAFB that was incompatible with FAFB's ability to carry out its current mission requirements or to undertake new missions, (2) failed to discourage the siting of incompatible uses adjacent to the SIA, and (3) precluded the siting of essential public facilities. Further, the Board

25

invalidated the ordinances, finding that the continued validity of the ordinances would substantially interfere with the fulfillment of the GMA's goals.

The City appealed the Board's decision to Spokane County Superior Court. That court reversed the Board's decision and affirmed the City's adoption of the challenged ordinances. Spokane County, the city of Spokane, and the SIA Board appeal to this court.

## ANALYSIS

A. *Incompatibility with FAFB's Mission Requirements*

The first question before us is whether the GMHB erred in concluding that the challenged ordinances violate the GMA as being incompatible with FAFB's ability to carry out its mission requirements or to undertake new missions.

*Standard of Review*

Comprehensive plans and development regulations under the GMA are presumed valid on adoption. RCW 36.70A.320(1). The board shall find GMA compliance unless it determines that the local plan or regulation is clearly erroneous in view of the entire record before it and in light of the goals and requirements of the GMA. RCW 36.70A.320(3). To find a city's actions "clearly erroneous," the board must have a "firm and definite conviction that a mistake has been committed." *Dep't of Ecology v. Pub. Util. Dist. No. 1*, 121 Wn.2d 179, 201, 849 P.2d 646 (1993). A board's order that fails to

26

apply this deferential standard of review is not entitled to deference from this court. *Quadrant Corp. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 154 Wn.2d 224, 238, 110 P.3d 1132 (2005). This "clear error" standard reflects the legislature's intent that the board "grant deference to counties and cities in how they plan for growth, *consistent with the requirements and goals of this chapter.*" RCW 36.70A.3201 (emphasis added). In effecting this balance, the legislature intended for "local planning to take place within a framework of state goals and requirements, [but] the ultimate burden and responsibility for planning, harmonizing the planning goals of this chapter, and implementing a county's or city's future rests with that community." *Id.*

Courts give substantial weight to a board's interpretation of the GMA. *Lewis County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 157 Wn.2d 488, 498, 139 P.3d 1096 (2006). "The burden of demonstrating that the Board erroneously interpreted or applied the law, or that the Board's order is not supported by substantial evidence, remains on the party asserting the error." *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.,* 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

The Administrative Procedures Act (APA), chapter 34.05 RCW, governs judicial review of challenges to decisions by a board. The APA requires us to review the record created before the board, not the record before the superior court. *Lewis County*, 157

27

Wn.2d at 497. We review legal conclusions de novo. *Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008). In reviewing claims that the order is not supported by substantial evidence under RCW 34.05.570(3)(e), we determine whether there is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997).

B.       *Development Incompatible with a Military Installation's Mission*

RCW 36.70A.530 provides:

(1) Military installations are of particular importance to the economic health of the state of Washington and it is a priority of the state to protect the land surrounding our military installations from incompatible development.

. . . .

(3) A comprehensive plan . . . [or] a development regulation, should not allow development in the vicinity of a military installation that is incompatible with the installation's ability to carry out its mission requirements. A city or county may find that an existing comprehensive plan or development regulations are compatible with the installation's ability to carry out its mission requirements.

In conjunction with RCW 36.70A.530, the legislature included its finding:

"The United States military is a vital component of the Washington state economy. The protection of military installations from incompatible development of land is essential to the health of Washington's economy and quality of life. *Incompatible development of land close to a military installation reduces the ability of the military to complete its mission or to undertake new missions*, and increases its cost of operating. The

28

department of defense evaluates continued utilization of military installations based upon their operating costs, their ability to carry out missions, and their ability to undertake new missions."

RCW 36.70A.530 (note) (emphasis added).

1.    *Adopting the proper legal standard*

The City urges this court to adopt an objective test, based on the DOD and FAA standards for determining the meaning of "incompatible development." It argues that various standards relied on in the JLUS would allow multi-family development in areas between 65 and 69 Ldn, provided that appropriate noise reduction measures are taken. We do not believe that adopting a standard that focuses on a current Ldn level is consistent with our legislature's intent.

Our legislature's 2004 finding establishes that "incompatible development" must be defined more broadly than a military installation's current mission, it must also account for the installation's ability to undertake new missions. Indeed, an installation's ability to meet both current *and future* military needs is a significant factor in determining whether to close or to continue operating a military installation.

The City also argues that the GMHB erred when it adopted the JLUS's definition of "incompatible" as development that is inconsistent with the JLUS. The City argues that the court, not the JLUS participants, must define legal standards. We reject these

29

arguments because the GMHB did not adopt the JLUS's definition. Although the GMHB considered development inconsistent with the JLUS as *evidence* of incompatibility, it did so because the JLUS participants had expertise in knowing how residential development could adversely impact the current and future operations of FAFB.

In its decision, the GMHB defined "incompatible development" as "development that is incompatible with the military installation's ability to carry out its mission requirements or to undertake new missions." CP at 72. Because we give substantial weight to the Board's interpretation of the GMA, and because the Board's definition is consistent with our legislature's focus on current *and future* mission needs, we adopt the Board's definition. We hold that, for purposes of RCW 36.70A.530, "incompatible development" means development that is incompatible with a military installation's ability to carry out its current or future missions.

Moreover, because this definition is factually intensive, we agree with the Board's decision to give weight to knowledgeable persons with expertise and to collaborative agreements involving such entities, such as the JLUS. The DOD-funded JLUS was a collaborative planning effort involving local stakeholders, including the city of Airway Heights. Its participants included experts in various policy and technical capacities. Its technical advisory group consisted of county and city planners, military planners,

technical specialists, and state agency and tribal representatives. It based its noise recommendations on the AICUZ study and a technical Air Force NOISEMAP computer model, which is approved by the Environmental Protection Agency. The study assessed four future mission scenarios with the 20-year operations forecast of the SIA. Based on this technical information, the JLUS developed noise contours and standards to guide future land use decisions.

   2.   *Appropriate deference to the City's ordinances*

The City argues that the GMHB, by giving weight to these experts and the JLUS, failed to give it the deference required under the GMA. We disagree. Encouraging collaboration between communities, a military installation, and other knowledgeable participants is consistent with the goals stated in the GMA. We agree with the City that one important goal is to give cities and counties a broad range of discretion "in how they plan for growth, *consistent with the requirements and the goals of* [*the GMA*]." RCW 36.70A.3201.

Another important goal, however, is to protect the economic health of the state of Washington and local communities impacted by military installations. RCW 36.70A.530(1). This latter goal is best realized by giving due weight to the opinions of stakeholders and those with expertise, such as the JLUS participants. Here,

31

the GMHB properly applied a clearly erroneous standard when reviewing the challenged

ordinances. The GMHB also properly gave due weight to the opinions of stakeholders

and communities impacted by FAFB, in addition to the JLUS. We conclude that the

GMHB properly achieved both GMA goals as outlined above.

3.   *Evidentiary sufficiency that the ordinances violate RCW 36.70A.530*

The City argues that there is insufficient evidence that its challenged ordinances

are incompatible with the FAFB's ability to carry out its current or future missions. In

support of its argument, it asserts that the challenged ordinances are consistent with

various federal standards, and the conditional use permitting process assures that the

proper balance will be achieved between the City's needs and FAFB's current and future

mission requirements. We reject the City's argument for three reasons.

First, as the Board observed:

> The conditional use permit calls for current noise level studies, with
> sound insulation required at certain noise thresholds. By focusing on noise
> contours determined at the time of project application, the Ordinances fail
> to make allowances for future mission changes or the use of different
> aircraft at FAFB.

CP at 78.

Second, the ordinances violate the JLUS by allowing once commercial property in

an MIA 4 zone to be reclassified multi-family residential. This violation of the JLUS, as

32

mentioned before, is evidence that the challenged ordinances are incompatible with FAFB's ability to carry out its current or future missions.

Third, numerous persons and agencies with expertise weighed in against the challenged ordinances and provided reasons supporting their conclusions why potential multi-family residential development in the MIA 4 zone was incompatible with FAFB's ability to carry out its current or future missions.

Where a party challenges the sufficiency of the evidence, we examine whether there is evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises. *Miller v. City of Tacoma*, 138 Wn.2d 318, 323, 979 P.2d 429 (1999) (quoting *Robinson v. Safeway Stores, Inc.*, 113 Wn.2d 154, 157, 776 P.2d 676 (1989)). For the reasons explained above, we conclude that there is sufficient evidence for the Board to be left with a firm and definite conviction that a mistake had been made, and that the challenged ordinances were clearly erroneous in light of the goals and requirements of the GMA.

C.     *Discouraging the Siting of Incompatible Land Uses Adjacent to the SIA*

The GMA subjects local government land use planning affecting general aviation airports to RCW 36.70.547, which states that a city "shall, through its comprehensive plan and development regulations, discourage the siting of incompatible uses adjacent to such

33

general aviation airport." The Board found that, because numerous local aviation experts

and agencies opposed the proposed development as incompatible, the ordinances violated

RCW 36.70.547. The Board also considered the 2008 hearing officer's findings in the

*Deer Creek* dispute.

The City asserts that insufficient evidence supports the Board's findings and

conclusion that the challenged ordinances violate RCW 36.70.547. The City argues that

the challenged ordinances actually discourage residential uses that may be incompatible

with the SIA because the conditional use requirements make residential construction

difficult. Spokane County, the city of Spokane, and the SIA Board respond that the

challenged ordinances and maps, by redesignating commercial property multi-family

residential, actually encourage incompatible residential development.

In *Kittitas County v. Eastern Washington Growth Management Hearings Board*,

172 Wn.2d 144, 175, 256 P.3d 1193 (2011), the court emphasized the deference that the

board must grant cities and counties when reviewing local plans and regulations under

RCW 36.70.547. There, the court framed the issue as, "whether the County's failure to

prohibit residential uses and higher-than-recommended densities by the Washington State

Department of Transportation (WSDOT) violates the GMA." *Id.* at 174. There, the

board found that, because the county's regulations diverged from WSDOT's

34

recommendations for land near airports, the county's challenged regulation violated the

GMA. *Id.* In reversing the board, the *Kittitas County* court stated:

> The Board gave substantial weight to WSDOT's recommendations. The Board, however, is supposed to give deference to the County unless the County clearly erred. The statutory scheme requires only that counties "discourage" incompatible uses. Discouragement is not the same as prohibition. The County clearly did not follow all of WSDOT's recommendations. While this may be imprudent, the statutory scheme does not suggest that counties *must* follow the advice of WSDOT. Considering the loose statutory language and the requirement of boards to defer to counties' planning choices, the record before the Board does not establish firmly and definitely that the County erred.

*Id.* at 174-75 (citations omitted).

In reviewing the evidence before the Board, we have three concerns. First, the comments relied on by the Board from the FAA, WSDOT, and Greater Spokane Incorporated relate to their concerns about how the challenged ordinances would impact both FAFB and the SIA. Because RCW 36.70.547 requires us to focus on how the challenged ordinances will impact the SIA, the broad comments from these three entities do not provide the clear evidence needed, given the deference the GMA requires the Board to give to the City's choices. Second, some of the agency comments focus on the City's noncompliance with the JLUS. We note that the JLUS was largely focused on the current and future needs of FAFB, not the SIA. Third, the 2008 *Deer Creek* findings of the hearing officer were based on evidence that might have changed in the five or more

35

years leading up to the Board's decision under review.

Because of these concerns, we focus on the SIA's most recent comments opposing

the challenged ordinances. In a May 2013 letter to Mr. Braaten, the SIA wrote:

    2.      Adopting zoning that permits residential use within close proximity to the Airport may ultimately create situations requiring preventive or remedial mitigation actions to ensure that the ability of the Airport to develop and operate without limitations is not hindered. . . .

    3.      . . . The area of C-2 that is located in the vicinity of Deer Heights Road is cause for concern that this *may* present an incompatible land use related to the future parallel runway. . . .

AR at 667 (emphasis added). Although the SIA objected to the challenged ordinances,

the first objection was that preventative or remedial mitigation might be necessary.

Preventative or remedial mitigation has been incorporated into the City's challenged

ordinances as part of the conditional use process. The second objection was directed to

the property at issue, but was equivocal whether development on the property would be

incompatible with the future parallel runway. Consistent with the *Kittitas County* case,

we conclude, "Considering the loose statutory language and the requirement of boards to

defer to the [City's] planning choices, the record before the Board does not establish

firmly and definitely that the [City] erred." *Kittitas County*, 172 Wn.2d at 175.

D.     *Precluding the Siting or Expansion of FAFB or the SIA*

RCW 36.70A.200(5) states that "[n]o local comprehensive plan or development regulation may preclude the siting of essential public facilities." RCW 36.70A.200(5) applies to expansions of essential public facilities. *City of Des Moines v. Puget Sound Reg'l Council*, 108 Wn. App. 836, 844-45, 988 P.2d 27 (1999).

The parties stipulated that both FAFB and the SIA are essential public facilities within the meaning of the GMA:

> The parties acknowledge and agree that [FAFB] and Spokane International Airport ("SIA") are two of the region's most essential public facilities and that the parties should cooperate to discourage development that is incompatible with either facilities' operational needs and/or its ability to carry out its current and/or future missions . . . .

AR at 1121.

The City argues that the Board erred in concluding that the challenged ordinances preclude the siting or expansion of either FAFB or the SIA. In our analysis above, we held that there was sufficient evidence for the Board to find that the challenged ordinances allowed incompatible development with respect to FAFB's ability to carry out its current and future missions. But this finding does not necessarily establish a violation of RCW 36.70A.200(5) that requires that the plan or regulation "preclude" an essential public function. The word "preclude" means to "'render impossible or impracticable.'"

37

*See id.* at 847. Applying this standard, there is little or no evidence that the challenged

ordinances would render impossible or impracticable current or contemplated operations

of either FAFB or the SIA. Considering the requirement that the Board must defer to the

City's choices, the record before the Board does not establish firmly and definitely that

the City erred in enacting the challenged ordinances.

Affirmed in part; reversed in part.

Lawrence-Berrey, A.C.J.

WE CONCUR:

Siddoway, J.

Korsmo, J.

38